ALLEN ROBBINS, Appellant, *v.* CHARLES BUTLER *et al.,*
Appellees.

#### APPEAL FROM COOK.

Any interest in the result of a suit, renders a witness incompetent. But a witness may be made competent by showing that he had, in good faith, divested himself of all interest, even though it be done for the purpose of giving his testimony in the case.

The shareholders in a private joint stock company are each personally liable for all the debts of the company, and cannot transfer this liability to others, except in the way pointed out in the articles of association.

An interest derived under a parol agreement for a sale of lands, renders a witness incompetent, since the statute of frauds and perjuries may not be pleaded.

The admissions of a party to a fact, wherever or however made, are evidence against him, even though they may be found in an answer or bill in chancery.

A trustee cannot be the purchaser, directly or indirectly, of the property entrusted to him to sell.

THIS was a bill filed by Charles Butler, John P. Chapin, and Walter S. Gurnee, on behalf of themselves and all other shareholders in the Chicago Land Company, and Mahlon D. Ogden, the surviving trustee of said association, against Allen Robbins, for a specific performance of a contract for a sale of land in the city of Chicago.

The bill avers, that on the 31st of May, 1847, William B. Ogden and Allen Robbins were owners in fee simple, as joint tenants, and not as tenants in common, of certain parcels of land, situate in Chicago, Cook county, Illinois, (describing them.)

· That one Jane E. Wight, widow of John F. Wight, deceased, was entitled to dower in said land, and that the said Ogden and Robbins, for the purpose of settling her dower claim, and for other purposes, on the same day entered into an agreement in writing, as follows, to wit:

"This indenture, made this 31st day of May, A. D. 1847, witnesseth, Whereas, we, William B. Ogden, of the city of Chicago, in the county of Cook and State of Illinois, and Allen Robbins of the city, county and State of New York, hold the title to and are owners in fee simple, as joint tenants, and not as tenants in common, of (here follows a description of the land.)

"And whereas, Jane E. Wight, of Erie, in the State of Pennsylvania, widow of John F. Wight, late of Erie aforesaid, deceased, did release to us her right of dower in all said premises, and did quit-claim to us all the right, title and interest whatsoever which she had or might be supposed to have therein. Now be it known, that in consideration of said releases of dower, and quit-claim of all right and interest in all of said

premises, made and duly executed by the said Jane E. Wight to us, and for other considerations to us thereunto moving, we hereby agree as follows: That said lots and lands shall be placed in the immediate care, and be under the exclusive supervision and management of Ogden and Jones of Chicago, (and the survivor of them, and their successors in business in Chicago,) subject to the general directions of us, the said Ogden and Robbins, the survivor of us, our executors and administrators; that the said Ogden and Jones, their survivors or successors in business in Chicago, shall proceed to survey, plat, subdivide and and improve said property; that such surveys, plats, subdivisions and improvements, including the erection of bridges, buildings, fences, the making of streets, avenues and alleys, the construction of side walks, grading and macadamizing, paving and planking of roads, streets, avenues and alleys, the planting of trees, shrubs and plants, the fencing and cultivating of lots, blocks and fields, the employment of laborers, horses and superintendents, and all other necessary expenses, the laying out of public and private squares, and places, the appropriation and donation of lands for the same, and for churches, schools, or other public institutions, and for any other purposes which shall, in the opinion of said Ogden and Jones, their survivor or successors, be calculated to advance the value of the property, shall be done by said Ogden and Jones, their survivor and successors, under the general direction of us, the survivor of us, our executors and administrators, when, where, and to such extent as we and they shall think proper; and they shall also make, under the general advice and direction of us, the survivor of us, our executors and administrators, any and all such other improvements, and take such steps and proceedings in connection with, or relating to said property, as to them or us, the survivor of us, our executors and administrators, shall, from time to time, seem meet and proper, and for the best interest of said property, and most beneficial results to be derived from the same.

" The said Ogden and Jones, their survivor and successors in business, shall proceed to make sales of said premises, or lease or otherwise dispose of, in part or in whole, when, where, and as they shall, in their discretion, think and deem to be most advantageous and conducive to the best interests of said property, and most beneficial to the results to be realized from the same; such sales, leases, or other disposition of said property, to be made at such time or times, hereafter, and in such manner and on such terms for cash and credit, or in exchange for other property, thing or things, or partly on credit, or partly for payment in hand, or for other property or thing in exchange, as we or our survivor, executors and administrators, or the said Ogden

and Jones, their survivor and successors in business, in Chicago, shall, in our or their discretion, think to be most advantageous to said property, and best calculated to enhance the amount to be derived therefrom. All the accounts with said property shall be kept by and with Ogden and Jones, their survivor or successors, at their office in Chicago. And they shall make semi-annual statements of their accounts with said property to the said Allen Robbins, and to James C. Marshall, of the borough of Erie, aforesaid trustee, and in case of his death, to the said Jane E. Wight, her executors or administrators, on the first days of February and August in each year, and shall at such times pay over any surplus proceeds then in their hands, as is herein provided for, such payments to be made at their office, unless otherwise agreed upon hereafter. The costs of all the aforesaid improvements, and the amount of all disbursements hereinbefore provided for, together with all taxes, assessments, and other necessary expenses or proper charges, accrued or accruing, incurred or charged on or against the aforesaid premises, or growing out of the general care and management thereof, together with ten per cent. commissions, to be charged by said Ogden and Jones, their survivor or successors in business, for their services, on the amount of all such taxes, assessments, expenses and disbursements, and on the amount of the costs of all improvements made in accordance herewith, and on the amount of all sales made of said property, to be first reserved by said Ogden and Jones, their survivor or successors in business, at such semi-annual statements of their account, to be made by them from the proceeds of any sales, rents, or other receipts realized by them from said property. And six per cent. interest is to be allowed them upon any balance of accounts in their favor with said property, until the same shall be paid them. And they are, in like manner, to allow six per cent. interest on any balance in their hands on the first day of February or August in each year, until the same shall have been paid over by them, or until the party entitled to the same shall have been notified of their readiness to pay over the same ; the said Robbins from time to time to pay the said Ogden and Jones one-half part of any such excess of disbursements by them, and to receive the same, with six per cent. interest, back again from them from any future balance of account, in favor of said property, on the books of Ogden and Jones. When all of the above items of disbursements, charges, expenses, and interest shall have been first fully met, returned, and satisfied, from the proceeds of said property, or otherwise, to said Ogden and Jones, and their successors, and to said Robbins, then one equal one-third part of any surplus net proceeds which shall be received therefrom, over and above

the current and accruing disbursements and expenses herein-before mentioned and provided for, shall be applied in payment to said Allen Robbins and to Ogden and Jones, herein named, or to their respective representatives, and for their respective sole use and benefit; each party receiving half, until they shall have been paid altogether the sum of eleven hundred and four $\frac{53}{100}$ dollars, with six per cent. interest thereon from the date hereof; and the further sum of two thousand and seventy-six dollars and forty-nine cents ($2,076.49), with six per cent. interest from and after the fifth day of February, A. D. 1849, until paid, provided the same shall not be paid previous to the fifth day of February, A. D. 1849, from sales made from the property hereinbefore described. All like surplus net money proceeds received from the other two-thirds part of said prop-erty, to be from time to time, on rendering semi-annual state-ments by said Ogden and Jones, their survivor and successors, of their accounts, paid over to said Allen Robbins, and Ogden and Jones, or their legal representatives respectively, according to their respective interests in said proceeds, to wit, one-half to said Allen Robbins, or his legal representatives, and the other half to said Ogden and Jones, or their legal representatives, for the sole use of them, and for their respective representatives. When the aforesaid sums of eleven hundred and four $\frac{53}{100}$ dollars, and two thousand and seventy-six dollars and forty-nine cents, with interest as aforesaid, shall have been fully paid said Robbins, Ogden and Jones, from the net proceeds of said one-third part, after all other liabilities, and accruing and current charges hereinbefore named, shall have been fully met and paid from the general proceeds of said property, any further net proceeds received and realized from said Ogden and Jones, or by us, from the said one-third part from which the aforesaid payment to Robbins, Ogden and Jones shall have been pre-viously made and deducted, shall be paid over to the said James C. Marshall, trustee, as aforesaid, or, in case of his decease, to the said Jane E. Wight, her executors and administrators; and when all previous expenses, charges, taxes, assessments, costs of collections, and disbursements for improvements, or for services rendered or otherwise, and all commissions on the same, and on all sales made, as is hereinbefore provided for, shall have been paid and satisfied, and the sum of eleven hundred and four $\frac{53}{100}$ dollars, with interest from the date hereof, and the further sum of two thousand and seventy-six dollars and forty-nine cents, with interest from and after February fifth, A. D. 1849, (provided it shall not be sooner received and paid from proceeds of said property, as is herein provided), shall also have been realized from the net proceeds of one equal third part of sales and receipts

Robbins *v.* Butler et al.

from said premises, and have been paid over to said Robbins, Ogden and Jones, or to their respective legal representatives, then, at the request of the said James C. Marshall, trustee, as aforesaid, or in case of his decease, of the said Jane E. Wight, or her executors or administrators, or, if desired, by us, or the legal representatives of either of us, the equal one-third part of any remaining unsold portion of said premises, (if any), after the same shall first have been legally and equitably divided, together with one-third in amount and value of all the outstanding contracts, assets, or other effects, (if any), belonging ·to and resulting from said property, shall be released by us, and conveyed to the said James C. Marshall, trustee, as aforesaid, or in case of his decease, to the said Jane E. Wight, her executors and administrators, or to whom he, she or they may direct, and all his, her or their claims upon us, under or by virtue of this agreement, shall thereby and thereupon be fully settled, discharged and satisfied; and a like division of the other two-thirds, half to said Robbins or his legal representatives, and half to the said Ogden and Jones, or their legal representatives, for their respective use and benefit, shall also then, or at any other time thereafter, be made when desired by either party thereto, or by the legal representatives of such party hereto; and this agreement, with its provisions, conditions and stipulations, shall thereupon be fulfilled, terminated, and held for naught. Should no such request be made by either party, however, nor by the legal representatives of either of said parties, the said property shall continue to be managed as is hereinbefore provided for, until such request be made, at least by one of the parties herein named, or their legal representatives, or until the whole be disposed of, and the proceeds thereof be realized and divided as hereinbefore provided for. Should the equal one-third of said property not prove to be sufficient to meet the expenses accruing on account thereof, as is hereinbefore provided for, and also to pay the said sum of eleven hundred and four $\frac{53}{100}$ dollars, with interest thereon, as aforesaid, and the further sum of two thousand and seventy-six dollars and forty-nine cents, with interest thereon, as hereinbefore provided, to said Robbins, Ogden and Jones, neither the said James C. Marshall, nor the said Jane E. Wight, shall, in that event, be liable for any such deficit, but the same shall be borne and suffered by the said Robbins, Ogden and Jones, and their legal representatives. The only claim or interest growing out of this instrument of writing made by us, is intended and hereby declared to be but a personal contingent claim or money demand against us personally, for a part of the net money proceeds to arise from the sales or other disposition of the premises named herein, and is

not and shall not be construed as creating any right to the realty or fee of the same, until the happening of the contingent condition herein provided for, requiring a division and conveyance from us of a portion of the unsold remainder of said property, if any remain, nor shall it then constitute any claim to the realty or fee thereof, until such conveyance shall have actually been executed by us, or our legal representatives, and delivered to the said James C. Marshall, trustee, as aforesaid, or, in case of his decease, to said Jane E. Wight, her executors or administrators. It is hereby stipulated, and expressly agreed, that the said Ogden and Robbins, and their legal representatives, shall have the privilege and right of purchasing of said James C. Marshall, trustee, as aforesaid, or, in case of his decease, of the said Jane E. Wight, or her executors or administrators, all and every interest which he, she or they may acquire, under or by virtue of this agreement, at such price and terms as any other person or persons shall agree or bind himself or themselves to give or pay for the same, (provided he, or, in case of his decease, she, or her executors or administrators, shall elect to sell the same); and any sale of such interest, without first offering the same to said Ogden and Robbins, or their executors or administrators, at the like price, and on the like terms as those for which the same shall be sold to another person or persons, shall be declared void; and said Ogden and Robbins, or their executors or administrators, shall, at their election, be declared the purchasers of the same, upon paying to said Marshall, trustee, as aforesaid, or, in case of his decease, to said Jane E. Wight, or her executors and administrators, the price for which said premises shall be sold, on complying with the terms and conditions of such sale or sales.

"The said Ogden and Robbins, and the survivor of them, and in case of decease of both of them, their executors, administrators, or the executors or administrators of either of them, shall have the right and power, in case said Ogden and Jones, and the survivor of them, shall cease to act as the agents of the aforesaid lands and lots, and they shall be succeeded in business by another party or firm, to take away and remove said agency and business from such successor, and give and commit the same to such person or persons as shall be appointed by the judge of any court of chancery, held in said county of Cook, to act in the premises as the agent for, and to have the management of said property in as full a manner as said successor or successors might do by virtue hereof, and successively to transfer such agency and management from time to time, as they may see fit, in the like manner and with the like authority. Notice of the application to such judge for such appointment,

shall be given personally to the parties hereto, or published in some newspaper published in the city of Chicago, for sixty days immediately preceding such application; but the power of such successor may be suspended without, such notice, by either of said Ogden and Robbins, or either of their executors or administrators, by filing notice of such suspension in the recorder's office of said Cook county aforesaid,

"In witness whereof, the said Ogden and Robbins have hereunto set their hands and seals, the day and year first above written.      W. B. OGDEN.  .  [L. s.]
ALLEN ROBBINS. [L. s.]"

"We hereby accept and agree to and approve of the terms, conditions and provisions in the above instrument contained.

"Witness our hands and seals this thirty-first day of May, A. D. 1847.      JAMES C. MARSHALL. [L. s.]
JANE E. WIGHT. [L. s.]"

Acknowledged by Wm. B. Ogden, Allen Robbins, and James C. Marshall, May 31st, 1847, and by Jane E. Wight, June 28th, 1847, and recorded in the recorder's office of Cook county, July 9th, 1847.

That at the making of said agreement, the firm of Ogden and Jones therein mentioned, consisted of William B. Ogden and William E. Jones; and afterwards, on the first of July, 1850, they associated with them Mahlon D. Ogden, one of the complainants, and one Edwin H. Sheldon, and thereafter transacted business under the name of Ogden, Jones & Co. That on the 9th of March, 1851, the said Jones deceased, leaving the said Wm. B. Ogden as the survivor of the said Ogden and Jones. That the said Wm. B. and Mahlon D. Ogden and Sheldon continued the business, after said Jones' decease, as partners, under the name of Ogden, Jones & Co., as the successors of said Ogden and Jones, up to the 1st of January, 1853, when they associated with themselves one Edwin R. La Bar, and continued the transaction of said business under the name of Ogden, Jones & Co. That said La Bar deceased on the 2nd of January, 1854, and said business was continued by Wm. B. and Mahlon D. Ogden and Sheldon, under the name of Ogden, Jones & Co., until the 1st of November, 1855, when one Stanley H. Fleetwood was admitted into the firm, and since then they have transacted business under the name of Ogden, Fleetwood & Co. That said firm of Ogden, Jones & Co., consisting of its different members, at different times, were the successors in business of the firm of Ogden and Jones, and that Ogden, Fleetwood & Co. have been since the 1st of November, 1855, and are now, the successors of said Ogden and Jones.

That on the first of June, 1852, the said Wm. B. Ogden, the survivor of said Ogden and Jones, and acting as such survivor,

and for said Ogden, Jones & Co., the successors in business of said Ogden and Jones, for himself and the other parties to the agreement above set forth, entered into a verbal agreement with John Bradley and A. Hyatt Smith, which was, on the 10th of November, 1852, reduced to writing, and is as follows:

" Whereas, Allen Robbins, of New York, and Wm. B. Ogden, of Chicago, in the State of Illinois, in and by their certain indenture and instrument of writing, dated 31st day of May, A. D. 1847, and duly recorded in Cook county, in the State of Illinois, on the ninth day of July, 1847, in book 24 of deeds, on pages 37, 38, 39, 40 and 41, did, among other things, for a consideration therein expressed, contract, consent and agree that Ogden and Jones (a firm composed of the said Wm. B. Ogden and Wm. E. Jones,) their survivors and successors in business, shall proceed to make sales of, or lease or otherwise dispose of the lands and premises described in said indenture, in part or in whole, when, where, and as they shall in their discretion think and deem to be most advantageous and conducive to the best interests of said property, and most beneficial to the results to be realized from the same. And whereas, James C. Marshall, of Erie, Pennsylvania, trustee of Jane E. Wight, and named in said indenture, did in writing assent to the same. And whereas, William E. Jones, of the said firm of Ogden and Jones, has, since the making of said indenture, died, leaving surviving the said Wm. B. Ogden, the other member of said firm of Ogden and Jones, named in said indenture. And whereas, the said Wm. B. Ogden, survivor as aforesaid, acting for himself, for the said Allen Robbins, and for said James C. Marshall, trustee of the said Jane E. Wight, parties named in said indenture, and having an interest in said premises, or the proceeds thereof, under and by virtue of the provisions in said indenture contained, has, as party of the first part, agreed to sell and dispose of all the lands and premises hereinafter described, being part and parcel of said lands and premises in said indenture mentioned and specified, to John Bradley, of Burlington, Chittenden county, Vermont, and A. Hyatt Smith, of Janesville, Rock county, Wisconsin, party of the second part, and their heirs, on the terms and conditions hereinafter mentioned.

" Now, therefore, this contract made between the said party of the first part, before named and described, and the said Bradley and Smith, party of the second part, Witnesseth, that the said party of the first part has sold and disposed of to the said party of the second part, and to their heirs forever, all and every the lands and premises hereinafter specified, namely :"

(Here follows a description of the lands in controversy.)

" And the said John Bradley and A. Hyatt Smith, parties of the second part hereto, agree to pay to the said party of the first part hereto, at the office of Ogden, Jones & Co., in Chicago, for the lots, blocks, lands and premises hereinbefore named and described, the full sum of one hundred thousand dollars, in manner following, to wit: Twenty-five thousand dollars in cash on the execution of these presents, with interest from the first day of September, 1852; twenty-five thousand dollars on the first day of September, 1853; twenty-five thousand dollars on the first day of September, 1854; and twenty-five thousand dollars on the first day of September, 1855; together with six per cent. annual interest from the first day of September, 1852, to be paid annually on the first day of September, in each year, hereafter, on the whole sum from time to time remaining unpaid.

"And also agree that they will well and faithfully, in due season, pay, or cause to be paid, all ordinary taxes, assessed for revenue purposes, upon said premises, or any part thereof, subsequent to the year 1851; and also all other assessments which now or may be hereafter charged or assessed upon or against said premises, or any part thereof. But, in case the said parties of the second part fail to pay any or all such taxes or assessments upon said premises or appurtenances, or any part thereof, whenever and as soon as the same shall become due or payable, and the party of the first part shall pay from time to time, or at any time, any or all such taxes or assessments, or cause the same to be paid, the amount of any and all such payments so made by the party of the first part, shall immediately thereupon become an additional consideration, and payment to be made by the party of the second part hereto, for the premises herein agreed to be conveyed.

" And upon the faithful performance by the said second party hereto, of their undertakings in their behalf, and upon the payment, by them, of the principal and interest of the sum above mentioned, and in the manner and at the times specified, then under and by virtue hereof, and in accordance with the provisions, powers and intent of the above named indenture and agreement, dated 31st of May, 1847, and first hereinbefore referred to, and upon which this contract and agreement of sale and purchase is based, they, the said second party hereto, shall be entitled to, and shall thereupon and thereafter, when demanded by them, receive from said first party hereto, a deed or conveyance in law of all said lots, lands and premises hereinbefore named, the same to be duly executed and acknowledged and delivered to them, the said second party hereto, their heirs or assigns, and to convey to them, the said second party hereto, their heirs or assigns, all their (the said first party hereto)

right, title and interest, of, in and to the above described premises, with their appurtenances. And it is further mutually agreed between the parties hereto, that the second party hereto, (the first cash payment of twenty-five thousand dollars, to be made hereon, first being punctually paid on execution of these presents) may at any time hereafter, at their election, demand a deed for said premises, to which they shall be entitled, on thirty days written notice being given, they duly executing to the said first party hereto, in return, a proper bond and mortgage upon all of said premises; such bond and mortgage to contain a provision, that in case said second party shall fail or neglect to make any payment of principal or interest, or any part of such payment of principal or interest, when and as the same becomes due, then and thereupon the whole of said principal moneys and interest, named in said bond and mortgage, shall forthwith become due and payable, and suit, or foreclosure, or both, or other legal procedure, may be had for the collection thereof, the same as if so expressed in said bond and mortgage, in the first place, anything therein or herein contained to the contrary notwithstanding; and so, in case of failure on the part of the said second party hereto, to meet and make the payments of principal or interest, or any part thereof, when and as the same respectively fall due, it is in like manner agreed, that the whole amount of principal and interest then due, owing, accrued, or remaining unpaid hereon, shall thereupon become due and payable, and subject to suit, foreclosure or other legal proceedings, as provided in a case of bond and mortgage, as above named, anything hereinbefore contained to the contrary notwithstanding.

"It is understood, that the deed to be made, pursuant to this agreement, to the party of the second part, their heirs, shall include all the right, title and interest of said Ogden and Robbins, and all other parties named in said indenture of the 31st day of May, 1847, hereinbefore named, to the property and every part thereof, hereinbefore described, and contracted to be conveyed to the said party of the second part.

"In witness whereof, the said William B. Ogden, acting for himself, Allen Robbins, and James C. Marshall, trustee, and the said party of the second part, have hereunto set their hands and seals, this tenth day of November, A. D. 1852.

WM. B. OGDEN.    [L. s.]
JOHN BRADLEY.    [L. s.]
A. HYATT SMITH.    [L. s.]"

" Signed, sealed and delivered in presence of

S. H. FLEETWOOD."

Recorded, Nov. 19th, 1852.

That in making said contract, the said Wm. B. Ogden acted with the full knowledge and approbation of said Mahlon D. Ogden and Edwin H. Sheldon, his copartners, and that he intended to exercise all the power and authority vested in him individually, or in said firm of Ogden, Jones & Co., and to vest in said Bradley and Smith a complete equitable title to said land, upon the performance by them of their part of said contract, which was so understood by them, and by said firm of Ogden, Jones & Co., at that time.

That on the 13th of March, 1855, said Bradley and Smith executed a declaration of trust, stating that they had purchased the said property for the sole benefit, account and use of the Chicago Land Company.

That on the 2nd of May, 1853, Robert J. Walker, Eli Chittenden, A. Hyatt Smith, Charles Butler, William Sloan, John Bradley, Jacob P. Eastman, John P. Chapin, Edwin F. Johnson, Albert A. Bliss, William B. Hotchkiss, Walter S. Gurnee, and Daniel S. Miller, associated under the name and style of the Chicago Land Company, and entered into written articles of association between themselves, as shareholders, and said William B. Ogden, Mahlon D. Ogden and Edwin R. La Bar, as trustees, wherein, among other things, it was recited that—

Whereas, the subscribers to said articles had theretofore purchased certain tracts of land in the city of Chicago and vicinity, more particularly described in said articles; and whereas, only a portion of the purchase money had been paid on said several tracts of land, and there were considerable sums remaining to be paid, as the same should fall due, which said purchases had been made in the name of some one or more of the subscribers thereto, for the benefit of all, with the understanding that all of the property should for management and disposition be vested in trustees as therein named, for the benefit of all the parties in interest, and their assigns; and whereas, the parties to said presents, of the second part, had agreed to take and execute such trust upon the terms and conditions thereinafter named; therefore it was thereby agreed and declared, that

The name and style of the association shall be the Chicago Land Company, and its purposes and objects should be the management, improvement, development, lease, sale or other disposition of the lands acquired for the benefit of the members of said association, situate in the city of Chicago, in the State of Illinois, or in the vicinity of said city, and especially all the lands thereinafter described; and the said William B. Ogden, Mahlon D. Ogden, and Edwin R. La Bar, all of Chicago, par-

ties of the second part, were thereby created trustees for the purpose of carrying into effect said articles; and that

The title of all property owned or held, or to be owned or held, for the benefit of said association, should be held by the trustees in their individual names, in fee simple, as joint tenants, and not as tenants in common, to them and to their assigns, and to the survivors and survivor of them, and to his heirs and assigns.

That the premises proposed to be conveyed to said trustees were, among other premises, certain lots and lands contracted for by William Sloan and others, for account of said association, a particular description of which was not then at hand, but by reference to said contracts, would more fully appear, which provision refers, among other things, to the contract hereinbefore set forth, between the said William B. Ogden and John Bradley, and A. Hyatt Smith.

And that the title in fee simple to all of which property, lots and lands, should be duly conveyed to, and vested in said trustees, as soon as the same could be conveniently done; and it was in and by said articles of association further provided, that either of said trustees might resign, and discharge himself of his trust, by an instrument in writing, under seal, on executing such conveyances to his co-trustees or successor, as might be necessary to invest his co-trustees with all his interests and powers.

That the said Edwin R. La Bar afterwards, on or about 2nd of January, 1854, deceased; and that said Wm. B. Ogden, on the 19th of March, 1856, by an instrument under his hand and seal, resigned his said office of trustee, and on the 19th of March, 1856, by his deed of that date, conveyed to said Mahlon D. Ogden, all the right, title and interest in and to any lands or property held by him, as such trustee, and that Mahlon D. Ogden is now the sole surviving and remaining trustee of said association.

That the shares or certificates of said association might be transferred from time to time by the holder thereof, or his personal representative, by indorsement under hand and seal, and giving notice of such transfer to said trustees, with a proviso, that the assignee of such share or shares should become a party to said articles of association, by subscribing his name, and affixing his seal thereto.

That the said John Bradley and A. Hyatt Smith, on the 6th day of April, 1855, by their deed of that date, assigned, transferred and set over, unto Mahlon D. Ogden, as such trustee, his heirs and assigns, forever, all their right, title and interest in and to all the lands described in the said contract between William B. Ogden, and John Bradley and A. Hyatt Smith,

together with all rights which they might have under or by virtue of said contract.

That said John Bradley and A. Hyatt Smith, on the execution of said contract between themselves, and said William B. Ogden, to wit, on the 10th day of November, A. D. 1852, paid to the said William B. Ogden the full sum of $25,000, being the first payment under said contract, together with the sum of $295.83, for the interest thereon, from the 1st of September, 1852, to the time of said payment; and that the said Ogden indorsed upon said contract, a receipt of the same.

That the remainder of the purchase money of the premises was fully paid by the said Chicago Land Company, to the said William B. Ogden, and to the said firm of Ogden, Jones & Co., together with the interest on the same, at the times when the said purchase money and interest respectively became due; and that said John Bradley, A. Hyatt Smith, and the Chicago Land Company, have, from time to time, paid and discharged all taxes and assessments upon the premises.

That the trustees of said Chicago Land Company, under and by virtue of said contract with said Bradley and Smith, and soon after the execution thereof, entered into possession of said premises, and have ever since remained in possession.

That on the 20th of March, 1856, for the purpose of vesting the legal title to the undivided one-half of the premises mentioned in said last mentioned contract, which remained in the said William B. Ogden, in the said Mahlon D. Ogden, as trustee of the Chicago Land Company, the said William B. Ogden, by his deed of that date, conveyed and confirmed unto the said Mahlon D. Ogden, his heirs and assigns forever, the undivided one-half of the said premises, described in said last mentioned contract.

That heretofore, to wit, on the — day of ——, A. D. 1856, James C. Marshall and Jane E. Wight, by her deed of that date, released, remised, and forever quit-claimed unto Mahlon D. Ogden, his heirs and assigns forever, all right, title, claim or demand, which she might have in or to said premises, or any part thereof.

That Mahlon D. Ogden has applied to said Robbins to execute a deed to pass the legal title remaining in him to the undivided half of said premises, but that said Robbins refuses, and at times pretends that said William B. Ogden had no power, under the agreement of the 31st of May, 1847, to make said contract with said Bradley and Smith, and at other times that before the execution of said contract he had revoked the power of said Ogden under said agreement.

Charges, that said Ogden had full power to make said contract; that said power was irrevocable; that said Robbins was fully aware of the terms and conditions of said contract while it was in negotiation, and that he approved of them; that said power was not revoked, or if it was, neither said Bradley nor Smith, nor the shareholders of the Chicago Land Company, had any notice thereof; and that his omission to notify them of said revocation, knowing that they were about to enter into said contract, is such a fraud as will deprive him of all advantage which might otherwise be taken by reason of such revocation.

Prays for the usual process against Allen Robbins, requiring him to appear and answer said bill, but not under oath, and that he be decreed to execute and deliver to Mahlon D. Ogden a deed of conveyance of the legal title to an undivided half of said premises, and of all his right, title and interest therein, and for such other and further relief, etc.

Amended answer of Allen Robbins denies that Wm. B. Ogden did, on the 1st of June, or at any time prior to the 10th of November, 1852, enter into a verbal agreement with Bradley and Smith, for the sale of said premises, but admits the execution of the written agreement of the 10th of November, 1852.

Alleges, that defendant has no knowledge of the execution of the declaration of trust by Bradley and Smith, dated the 13th of March, 1855, and denies that said company was ever incorporated, or that it was known or recognized by any law whatever, public or private.

Denies that Wm. B. Ogden had, under the agreement in said bill set forth, full power to enter into the said agreement with Bradley and Smith; or that the power conferred upon said Ogden and Jones, their survivor and successors, was irrevocable; or that defendant was aware of said agreement when it was in negotiation, or that he assented to the making of it; or that the shareholders in said Chicago Land Company had no notice of the revocation of the powers committed to Ogden and Jones, their survivor and successors, etc.

On the contrary, defendant avers that after the execution of the agreement of the 31st of May, 1847, said Ogden and Jones accepted of the trusts; that they, and the firm of Ogden, Jones & Co., who succeeded said Ogden and Jones in business, from time to time, between the date thereof and the first of September, 1852, made several sales of small parcels of said estate, and incurred some expenses, and became entitled to some commissions, but the precise state of the account defendant cannot specify; that on the first day of September, 1852, the unsold portions of said estate were of the value of $250,000, and are now of the value of $600,000, and will continue to increase

largely for several years; that said property abuts upon each bank of the north branch of the Chicago river; that said river is navigable up to the extreme northern boundary of said property, and is valuable on account of its docking and wharfing privileges; that the Chicago, St. Paul and Fond du Lac Railroad, on the 1st of September, 1852, was, and now is, located over that portion of the property described as Wight's addition to Chicago, laid out on the west side of said north branch of Chicago river.

Defendant further represents, that the true intent and meaning of the trust aforesaid was to improve the property, and sell such portions thereof as should be necessary to pay for improvements, and discharge the taxes, costs, and other reasonable charges, which might be incurred in the management of the property, to reimburse to Ogden and Robbins the moneys by them expended in the purchase of the property, and in extinguishing such liens and incumbrances as existed upon it, and also to raise money to satisfy and discharge the dower claim of the said Jane E. Wight; that for these objects said property was placed under the supervision and management of said Ogden and Jones, and the survivor of them and their successors in business, subject, nevertheless, to the general directions of said Ogden and Robbins; that by the terms of said agreement it became the duty of said trustees,

1st. To improve, manage and disencumber the whole, and dispose of such portions of said property as should be necessary to accomplish the purposes of said trust, with care and faithfulness to the common interests of the parties to said agreement;

2nd. To render fair, just and accurate accounts, touching the execution of their said trust;

3rd. To promptly pay over the proceeds of said property to the persons entitled thereto, under said agreement;

4th. To pay interest on such balances as they might neglect to pay over;

5th. To make no other or greater sales of said property than should be sufficient to accomplish the object of said trust;

6th. To make partition of said property according to said agreement.

Defendant further represents, that the said Ogden and Jones, and their successors, made improvements upon said property contrary to defendant's directions, and were wasteful and extravagant in their management; and in view of these abuses of the trust, defendant, in the exercise of the reserved power contained in said agreement, determined to put an end to said trust, procure a division of said property, and to take his share under

26

his own control, when the time contemplated by said agreement arrived.

That pursuant to this determination, on the 4th of March, 1848, defendant wrote a letter to Ogden and Jones, which was received by them, containing the following: "I, therefore, give you notice, that you must not make any further improvements on the property, without my written assent, and in order to obtain this, you must furnish me with your proposed improvements, and the estimated cost of them. I also give you further notice, that I shall call for a division of the property as soon as the sales amount to sufficient to cover advances, which is, I believe, according to the contract." That on the 27th of August, 1852, defendant wrote a letter to Wm. B. Ogden, which contained the following: "I take this occasion to repeat the notice given you in my letter of March, 1848, that I shall require a division of the property as soon as the sales cover the advances, and I repeat my orders, that you must not make any further expenditures on the property, for improvements or otherwise, to which you have not my written assent, nor any sales exceeding in amount the advances, or any sale about which I am not consulted, and to which I do not give my assent." And the defendant further alleges, that on various occasions between the dates of said letters, he notified the said Wm. B. Ogden that he would not consent to the sale of the residue of said property, except so much as might be necessary to satisfy the trust contained in said agreement. Defendant further represents, that notwithstanding these repeated notices, the said Ogden, intending to defraud defendant in the premises, commenced negotiating for the sale of the whole of said property, and pretends that he did, on the first of June, 1852, bargain and sell the whole of it to Bradley and Smith, for $100,000. That said Bradley and Smith were then, and still are, both insolvent; and that said pretended purchase was made for the benefit of the Chicago Land Company. That said Wm. B. Ogden is either a stockholder in said company, or that there was a secret understanding between him and said company, that the profits of this speculation were to be divided between them. That there was an understanding that all the property purchased for said company, including this, should, for management and disposition, be placed in the hands of said Wm. B. and Mahlon D. Ogden, and Edwin R. La Bar, (who, on the 1st of January, 1853, was admitted into the firm of Ogden, Jones & Co.,) as trustees for the parties in interest; and that said lands, ever since the pretended sale to Bradley and Smith, have been under the control of the said Ogden, Jones & Co., and their successors, with power from said company to sell the same on commission.

Robbins *v.* Butler et al.

Defendant charges, that said sale did not take place on the 1st of June, but on the 13th of November, 1852 ; that he has never ratified the same, but repudiated it as soon as he was notified. That said Wm. B. Ogden was so anxious to make said sale in defiance of defendant's directions, that he consulted with several lawyers, as to his power to sell and compel defendant to join in a conveyance, and received advice adverse to his wishes, but persisted, notwithstanding, in making the sale. That the property was worth $250,000, and the consideration received was so grossly inadequate as to indicate a fraudulent breach of trust on the part of Ogden. That all the charges upon said property remaining due and unpaid at the time of said sale did not exceed $12,000, and the sale of the whole property to pay said balance was a breach of trust ; that said sale was illegal and void, contrary to equity and good conscience, and ought to be set aside.

Defendant further says, that the contract of sale set forth in said bill, does not purport to be the deed of defendant, nor is it executed in his name or sealed with his seal, and it cannot operate, either in law or equity, to bind him or affect his interest in the premises.

Defendant further says, that by the agreement of May 31st, 1847, the power to manage and make sales of said property for the purposes therein expressed, was conferred upon Ogden and Jones, and their survivor and successors in business at Chicago, subject to the general directions of Wm. B. Ogden and defendant ; that upon the organization of the new firm of Odgen, Jones & Co., July 1st, 1850, all the trusts, power and authority, which had before been held and exercised by Ogden and Jones, passed to and became lodged in Ogden, Jones & Co., and after the death of Mr. Jones, March 9th, 1851, the same devolved upon the surviving members of said firm, to wit, William B. Ogden, M. D. Ogden, and Edwin H. Sheldon, who continued business as the successors of the previous firms. That on the 1st of July, 1850, the new firm of Ogden, Jones & Co., did in fact assume the management of said estate, kept all the accounts, received all the payments, made all the disbursements, and transacted all the business relating thereto ; and after the death of Mr. Jones, the surviving members of said firm retained said business and continued to manage said property.

Defendant insists, that by the express terms of the said agreement, and according to the intention of the parties manifested by the acts and conduct of all concerned, the co-operation and act of all the successors in business of the said Ogden and Jones, were essential to the validity of any contract for the sale of any portion of said land, made after the 1st of July, 1850 ; that it was not competent for the said Wm. B. Ogden to

sell said lands, or any portion of them, after the decease of said Jones, without the personal co-operation and act of his said copartners, Mahlon D. Ogden and E. H. Sheldon, and that, therefore, the pretended sale to Bradley and Smith, was so far as defendant is concerned, unauthorized and void; and defendant claims the same benefit of this defense as if he had demurred to said bill.

Defendant, further answering, denies that said Ogden, in making said contract, acted with the full knowledge and advice of his said copartners, but whether he did, or did not, defendant insists that said contract is invalid.

Defendant further says, that the amount of money which was a charge upon said land, at the time of said sale, was uncertain, but defendant believes and avers that he had advanced and paid his full proportion, but if there should be any balance due from him, he offers to deposit, under the direction of the court, such sum as will suffice to pay such balance.

For the reasons and under the circumstances aforesaid, defendant insists that complainants are not entitled to relief, and prays to be hence dismissed, etc.

The complainants' proofs, as far as they are necessary to an understanding of the case, were as follows:

Stipulation admitting the execution and delivery of the following instruments set forth in the bill of complaint, to wit:

1. Agreement of May 31st, 1847, between Wm. B. Ogden, and Allen Robbins, and James C. Marshall, and Jane E. Wight.

2. Contract of sale of November 10th, 1852, between Wm. B. Ogden, and Bradley and Smith.

3. Declaration of trust by Bradley and Smith, March 13th, 1855.

Stipulation, admitting that, on the 2nd of May, 1853, Robert J. Walker and others, associated themselves together for the purposes and in the manner set forth in the articles of association before referred to.

That certificates for 18,400 full paid shares had been issued to the shareholders; that many of said certificates have been assigned and surrendered, and new ones issued, etc., until the shareholders were upwards of sixty, as in said bill alleged.

That the purchase money of said premises has been paid, and that Bradley and Smith, and the Chicago Land Company, have paid all taxes and assessments, as in said bill alleged.

That the trustees of said company entered into, and have remained in possession under said contract, as alleged in the bill.

That a deed in due form was presented to said Robbins for execution, and that he refused to execute the same, as alleged in the bill.

That no portion of the purchase money received from said Bradley and Smith, or said Chicago Land Company, has been received by said Robbins, and that he has always declined to receive the same.

Resignation of trusteeship by Wm. B. Ogden, dated March 19th, 1856, directed to the executive committee of said company, under his hand and seal.

Deed of Wm. B. Ogden to Mahlon D. Ogden, trustee, dated March 19th, 1856, releasing and quit-claiming all the right, title and interest, vested in him as trustee of said company, in and to the lands and premises therein described. Acknowledged March 20th, 1856.

Deed from Wm. B. Ogden to Mahlon D. Ogden, dated March 20th, 1856. After referring to the agreement of May 31st, 1847, between Wm. B. Ogden, Allen Robbins, Jane E. Wight and James C. Marshall, and to the contract of November 10th, 1852, between Wm. B. Ogden and John Bradley and A. Hyatt Smith, and reciting that the said Bradley and Smith did, on the 6th of April, 1855, assign said contract to Mahlon D. Ogden, trustee of said company, and that said contract had been fully performed on the part of said Bradley and Smith, and their assigns, for the purpose of vesting the legal title to the undivided half of the premises thereinafter described, which remains in said Wm. B. Ogden, in said Mahlon D. Ogden, this deed conveys to said Mahlon D. Ogden, the undivided half of the premises in controversy, particularly describing them. Acknowledged March 20th, 1856.

Release from Jane E. Wight to William B. Ogden, Allen Robbins, and Ogden, Jones & Co., dated June 30th, 1855, from all claims and liabilities under the agreement of May 31st, 1847. Acknowledged March 20th, 1856.

Assignment by John Bradley and A. Hyatt Smith to Mahlon D. Ogden, trustee, of the contract from Wm. B. Ogden to them, of November 10th, 1852. Dated April 6th, 1855.

The depositions of Bradley, Sheldon, and Steele, were offered on the part of complainants, and excepted to, on the ground of an interest, on the part of the witnesses, in the result of the suit. They were, however, admitted by the court, and exception taken ; but as this court has decided that they should not have been admitted, they are not inserted.

The deposition of William B. Ogden was excepted to by defendant, and excluded by the court below, but as the statements contained in it are necessary to an understanding of the opinion, it is given, and is as follows :

On or about the 31st of May, 1847, I and Mr. Robbins executed an instrument for the purpose of adjusting the dower of

Jane E. Wight in certain lands in Chicago, Sec. 5, T. 39 N., R. 14 E.

The instrument referred to, is the same set forth in the bill of complaint.

I made a sale of the unsold balance of the premises described in said indenture, to John Bradley and A. Hyatt Smith, as survivor of Ogden and Jones, about the 15th of June, 1852. Full contracts of sale were executed about the 10th of November, 1852. Several sales of small portions had been previously made to other parties, between May, 1847, and June, 1852. (Objected to.)

The paper exhibited, is the contract of sale with Bradley and Smith.

I know the signatures of Bradley and Smith. The signatures to the contract are genuine.

I had conversations relative to the sale of this property, with the defendant, at different times; first in Mr. Burch's banking office, in the back room occupied by Mr. Robbins, where I showed him a proposition—say about June 1st, 1852, or not long before the sale to Bradley and Smith—made by me to Mr. Ward, of Boston, for the sale of said property to him, at about $97,925, and of which proposition Mr. Robbins took a copy. At that time, I also informed Mr. Robbins that Mr. Ward had the refusal at that price; also, that Mr. Bradley and his associates were applicants for the purchase of the property, and that I had proposed to sell it to them at $100,000, provided Mr. Ward did not accept the proposition made him. And I proposed to give Mr. Ward notice that he must decide either to take it, or not, and I afterwards did give him such notice, and he declined, as he said, from inability to fulfill in time, and I then gave notice to Mr. Bradley and his associates, that they could have the property for $100,000. Some few days after giving Bradley such notice—I should think not three days—I met Mr. R. in front of the Tremont House. He asked me if I had concluded the sale to Mr. Bradley and associates. I told him that I had not, as they had not yet decided to take it, but I thought they would do so as soon as they could make their arrangement, which would be in a few days. He replied, that if they did not decide to take it very soon, he would not let them have it, and he did not know but that he would take it himself at that price. I told him I should be very glad to let him have it, if he wanted it. He declined to take it. These are all the interviews that I remember having had with Mr. R. previous to the sale to Bradley and associates.

Mr. Robbins made a proposition to sell me, or Ogden, Jones & Co., his third interest in the unsold property, named in the

contract of May 31st, 1847, for $15,000, including in such price his one-third advances for improvements and expenses, but exclusive of $2,362.11, or thereabout, advanced by him on account of the Jane E. Wight interest—that is, Mr. R. offered to take $17,362.11 for his entire interest, including all his interest in unpaid contracts, and all his advances, and proposed to receive payment as follows: In cash, $5,362.11; in one year, $4,000; in two years, $4,000; and in three years, $4,000, with six per cent. semi-annual interest. This proposition was made about November, 1851. My memorandum of it bears date Nov. 23rd, 1851. This proposition was considered too high, and was declined. (Objected to.)

According to the terms of this proposition, his estimate of the value of the property was $45,000, including balances unpaid on contracts, which I think was from three to six or seven thousand dollars, but I am not at all certain about the amount due on the contracts. (Objected to.)

I made a memorandum of said proposition at the time, and I now produce it just as I then made it, and hereto attach it. (Marked "Exhibit A.") (Objected to.)

I do not recollect positively the terms of payment in the Ward proposition, but I think they were much easier, and on longer time than the sale to Bradley and Smith. My impression is, that they extended from one to six years, or more, in annual payments, with six per cent. interest. I am not certain that there was not some abatement assented to from $97,925, in the proposed sale to Ward.

At the date of the sale to Bradley and Smith, the amount chargeable to the property for purchase money, advances, expenses and interest, was about $17,437.49, less about $2,299 received from previous sales, leaving $15,138.49, which was to be first paid as provided in the contract of May 31st, 1847.

I mean, by my answer to interrogatory 3rd, that I made a written memorandum of the proposition in June, which was accepted about the 15th, and the agreement of sale concluded thereby, but I gave the parties a few days to enable them to gather funds to make their first payment, $25,000. Meanwhile, I went to New York, and failing to return, they came there and closed the arrangements by full contracts, which, with details and particulars of sale, were there executed in duplicate.

The whole of the purchase money stipulated in said contract has been paid, with interest, substantially in accordance with the terms of the contract. The payments were all made by Bradley and Smith, or their assigns, and were all made to the successors of Ogden and Jones, as provided in the indenture of May 31st, 1847; and notice was given to the defendant, from time to time,

of such payments, and that his proportion of the same was held subject to his order. Jane E. Wight, or James C. Marshall, trustee, or both, were also notified, and made demand therefor, and have been paid, and have given receipts in full for their proportion thereof, and have duly conveyed their proportion of the premises to Bradley and Smith, or their assigns. (Objected to.) The survivor, and legal representatives of Odgen and Jones, have also received their portion of the proceeds of said sale in full, and deeds for their interest in the premises have been duly executed to the assignees of Bradley and Smith. (Objected to.)

*Cross-Examination.*— I have not in my possession the memorandum of the proposition submitted to Bradley and Smith, referred to in my answer to interrogatory 12th, but I have a rough memorandum of the substance of the proposition made at that time, which does not specify the terms of payment, but intimates a modification made as to time of drawing interest, on leaving out eight lots, the title to which was not included in the indenture of May 31st, 1847, and which they understood to be included in the proposition of $100,000, and which were then estimated at about $1,400, and the interest on the sale from the 15th of June to 1st of Sept., 1852, amounting to $1,250. It was agreed to leave out the eight lots, and make the sale draw interest from the 1st of Sept., instead of the 15th of June, as a set-off for them. The memorandum submitted reads, " Offered Sloan and others," Sloan being one of the parties associated with Bradley and Smith, and interested in the sale made to them, and most of the purchases made by him and his associates prior to or about the time of this, having been made in his name. (Memorandum attached, and marked " Exhibit B.")

The memorandum given to Bradley and Smith was substantially the substance of the contract afterwards executed. I first proposed giving them more time on the payments, but understanding from Bradley and others that Mr. Robbins preferred payment of a quarter down, I required it of them.

I don't remember positively that any terms of payment were expressed in said memorandum, but presume there were. There might have been two memoranda made, probably not. There might have been a memorandum for the time proposed and might not.

It was a memorandum of the proposition for the sale of the property to them, and in pursuance of which the contract was executed after acceptance by them. I don't know whether my name was signed to it or not — it was in my handwriting, I have no doubt, but it may have been written by some other party in the office, and I have no other copy of it than the one just filed.

I must have given them the memorandum previous to the 15th of June. They accepted the proposition about the fifteenth of

June. Whether they did so verbally or by writing, I do not recollect. There was no contract signed at the time between us. They accepted substantially without modifications, except that the time of payment might have been shortened, and the interest commencing September instead of June, in consequence of eight lots having been left out, which were not included in the indenture of May 31st, 1847.

It is my impression that the proposition did not mention any lot by name, but was for the unsold balance of the so-called Wight property. That subsequent to the indenture of May 31st, 1847, Mr. Robbins and Ogden and Jones bought sundry lots in Wight's addition, some of which were not mentioned in said indenture, but in the list of that property kept by Ogden and Jones were included as part of the Wight property, so called. Such lots as were not included in that indenture, I was not authorized to sell. Bradley supposed they formed part of the property and were included in the offer made to sell, and perhaps under the circumstances, had a fair right to think so. In order to correct the misunderstanding, an abatement of interest about equal to their valuation was assented to.

No memorandum of the bargain made by me with Bradley and Smith was signed by the parties prior to Nov. 10th, 1852. I might have signed a proposition made to them as above stated.

All the notice I ever received from Mr. Robbins up to the time of my negotiations with Bradley and Smith, was the letter I here submit, dated March 4th, 1848. (Annexed, and marked " Exhibit F.")

I did receive a letter from Mr. Robbins, dated August 27th, 1852, soon after it was written, and submit the same. (Annexed, and marked " Exhibit C.")

I understood at the time that Bradley and Smith purchased the property for themselves and others, who were, or were to be interested with them.

I know nothing of the extent of their association, but think I heard the names of Robert J. Walker, Mr. Eastman, Eli Chittenden, Mr. Page, and perhaps Mr. Chapin, and others I do not know.

At the time of making this sale to Bradley and Smith, I had no knowledge of the formation of any company for the purpose of buying, improving and selling this and other property in and about Chicago. In the spring of the next year, I think, a joint stock association, called the Chicago Land Company, was formed for the purchase and sale of property, of which the property in question formed a part.

I believe the pamphlet shown me to be a copy of the articles of association of said Land Company.

My understanding was, that a small part only of those who signed said articles of association, were interested at the time of the sale to Bradley and Smith. Many of them became subsequently interested. All that I remember to have heard spoken of at the time of the sale, besides Bradley and Smith, were Walker, Eastman, Johnson, Chapin, Chittenden, and Sloan, and I have no means of knowing that they were all interested, only from hearsay. Some of the others named in the articles, have not, at any time, to my knowledge, been interested, except as trustees.

The parties interested in the purchase, at the time of the negotiation with me, did not, to my knowledge, have it in contemplation to form such a company as they afterwards organized. I never heard of it.

According to my recollection, the first I heard of such a company, was when Mr. Eastman, and perhaps Mr. Chittenden, called upon me in New York, in the spring of 1853, for a copy of the articles of the American Land Company Association, of which I had long been a member, from which they proposed to draw articles of association for themselves and associates, and the articles they adopted are in a great degree copied from the articles of the American Land Company Association. They then solicited the house of Ogden, Jones & Co. to act as their agents for the management and sale of all their property in Chicago, of which the property in question formed a part, and they requested myself, Mahlon D. Ogden, and Edwin R. La Bar, to act as trustees for the association, to which we assented, our business being that of general land agents. I don't recollect hearing the association spoken of previous to this time.

I have never been interested in the stock of said company, not a dollar, directly or indirectly, at any time. It may be, that stock may have been assigned to me as trustee, for the benefit of the company, but I never was interested, in my own right, or for my own account, in any way.

Ogden, Jones & Co., and Ogden, Fleetwood & Co., for account of the trustees of the company, have made large sales of the property of the company, and have received commissions therefor, but I am not aware that they have sold for the company any of the property in question, except it be the right of way for the Chicago, St. Paul and Fond du Lac Railroad Company; but whether they received commissions on that sale I do not know.

At the time of the negotiation with Bradley and Smith, I did not expect to become thereafter an agent for the management and sale of the property in question. There was no such understanding. Nothing of the kind was thought of by me. The

sale was unconditional, the same as any other of the large sales made by me or my firm.

I am connected with Mahlon D. Ogden in business, whom I believe now to be the sole trustee of said company, but not so connected as to be entitled to any commissions he may receive as such trustee.

It strikes me that when the solvency of Bradley and Smith was doubtful, the trustees required a declaration of trust from them concerning this property, to prevent their creditors from reaching it.

I do n't know where Mr. Robbins spent the winter of 1851–2. I saw him in Chicago, I should think, about the 15th of June, or about the time and previous to the sale to Bradley and Smith. He was here, I think, when the offer was accepted by them. The purchase money was to draw interest from the 15th of June, and my impression was, that the sale was closed on that day, but it may have been that the proposition was made on that day, and the interest to draw from that time, and the sale consummated a short time after.

I think I made sale of a lot (a portion of this property) to Joy, previous to the negotiation with Bradley and Smith. I think it was made verbally, pending that negotiation, and they were to carry it out. I do n't remember the particulars, but they were to ratify the sale. The lot Joy was to have, was included in the sale to them; Ogden, Jones & Co.'s books will show.

I do n't remember anything about the paper now shown me, (an account of the sale to Joy.) Don't know who made it. Think it looks like Mr. La Bar's writing, who was a clerk in the office of Ogden, Jones & Co. at that time.

The paper now submitted is in the hand of Wm. P. Fleetwood, at that time a clerk in our office. It is probably the correct statement of the price and terms of a lot sold to Mr. Joy, and of the payments made thereon at that time, but probably incorrect as to the sale being made for Ogden and Robbins, provided the agreement of sale to Bradley and Smith was carried out. My recollection is, that Mr. Joy claimed that I had verbally agreed to sell the lot to him, before the sale of it, with the balance of the Wight property, to Bradley and Smith, and that I got Bradley and Smith, after the sale to them, to agree to let Joy have it at the price he claimed I was to sell it to him for, and that the clerk, not being advised of the circumstances, made out the account of Hiram Joy with Ogden and Jones. My impression is, that the money received from Joy was credited Bradley and Smith, and that this lot was included in the sale to them.

I do not know whether the amount due to Mr. Robbins, on account of this sale to Joy, was afterwards tendered to him.

Mr. Bradley reported to me that he had had interviews with Mr. Robbins in regard to the sale (to him and Smith), and that Mr. R. was willing to make a sale of the whole for $100,000. Whether he went to see Mr. R. at my suggestion, or not, I don't remember, but I think it was very likely. I did advise him to see Mr. R., and, though I had the power to sell, independent of Mr. Robbins, I thought it courteous to refer to him.

The commissions charged by us upon the sale to Bradley and Smith were precisely those provided for in the indenture of May 31st, 1847.

I think the first time I met Mr. Robbins, after the negotiation with Bradley and Smith, was in New York, in the office where I transacted my business, and it was after the completion of the contract of sale, and after the first installment was paid by them thereon.

I don't recollect that I assigned any reason to him for having made the contract. The interview was very short.

I did not give him as a reason that I wanted to get my commissions. No such thing took place.

Some time after the sale was made, I heard a street rumor that Mr. Robbins had objected to the sale, since the making of it, and I asked two or three attorneys whether there was any question as to my obligation and authority to fulfill the sale to Bradley and Smith, and was advised by Messrs. Judd and Wilson, who examined the matter fully, that I had authority. One (I think it was Mr. McCagg) had some question of it. The agreement of sale had been made in good faith, and I fulfilled it.

*Re-examination in chief.*—I think I did make sales of the property described in the indenture of May 31st, 1847, after March 4th, 1848, and prior to June, 1852, without advising with Mr. Robbins, and that he subsequently joined in the execution of deeds conveying the property as sold. I don't know that I ever consulted Mr. Robbins in regard to any of the sales previous to the sale to Bradley and Smith. On every first of August and February, Ogden and Jones, or their successors, notified him of any sales made in the previous six months, and rendered him an account thereof, which was all that was required by said indenture. (Objected to.)

The signature to the paper now shown me, is in my hand. I have received the consideration therein expressed. (Attached, and marked "Exhibit G.")

The commissions charged upon the sale to Bradley and Smith

stand to the credits of commissions still, on the books of Ogden, Jones & Co., and have never been paid to me.

I have received from the Chicago Land Company a bond of indemnity, and herewith hand it in. The signature thereto of Mahlon D. Ogden is in his hand.

EXHIBIT A.

*Statement of cost, etc., of Wight property.*

| | |
|---|---:|
| A. Robbins' one-third cost, including interest, Aug. 1, 1851, | $4,380.82 |
| Cost of improvements of his one-third, with interest to Aug. 1, 1851, and commissions, after deducting proceeds of all sales, | 1,914,23 |
| | $6,295.05 |
| For this Robbins asks | $15,000.00 |
| And to be reimbursed his one-half advances, with interest to Aug. 1, 1851, | 2,362.11 |
| Nov. 23, 1851, | $17,362.11 |

EXHIBIT B.

| | |
|---|---:|
| Offered Sloan and others the unsold portions of Wight property for | $100,000.00 |
| To draw interest six per cent. from June 15, 1852. The interest to 1st September amounted to | $1,250.00 |
| Eight lots—lots bought of J. H. Jones and Scammon, deducted—called | $1,400.00 |

EXHIBIT C.

*Chicago, August 27th*, 1852.

WM. B. OGDEN, ESQ.—*Dear Sir:*—I received Messrs. Ogden and Jones' accounts with the Wight estate, and find you still retain Mr. Smith a pensioner on this property. Ds. seventy-eight being charged for his services, a portion for plans for a bridge at Halsted street, a project on which I have not been consulted. As it must be evident that I am not satisfied with your management, and having lost confidence in your integrity as an agent, I shall esteem it a favor and kindness if you will at once accede to a division of the lots and lands at once. This course cannot be other than pleasant to you, as you will then be free from my complaints and censure. I take this occasion to repeat the notice given you in my letter to O. & J. of March, 1848, that I shall require a division of the property as soon as the sales cover the advances. And I repeat my orders, that you do not make any further advances on the property, for improvements or otherwise, to which you have not my written assent, nor make any sales exceeding in amount the advances, or any sale as to which I am not consulted, and to which I do not give my assent.

Messrs. Ogden and Jones have omitted to report the sale of a lot to Mr. Joy, which you named to me. Will you see that it is sent to me.

Yours respectfully,      ALLEN ROBBINS.

EXHIBIT F.

*East Granby, March 4th*, 1848.

MESSRS. OGDEN AND JONES, Chicago—

*Dear Sirs:* I received at this place your favors of 12th and 14th ult., with accounts relating to the Wight property. Your account contains some charges

Robbins v. Butler et al.

which require explanation, which I shall ask of your Mr. Ogden, when in New York, and if satisfactory, will then order a further payment made to you. You are aware that all improvements must have my approval, but you have proceeded so far without consulting me. It would be more satisfactory to me, and, in my opinion, just to all interests, if the improvements to be made were let by tender for cash payments, rather than let in such small detached portions evidently tributary to the business of your office. I notice that you charge newly Ds. 150, for Smith's superintendence, etc. This I think is too bad. I supposed that you were to superintend the business yourselves; if you cannot, you should at least pay your deputies. Your commissions are certainly sufficiently ample for that, and all the other very onerous duties you perform. I have not the contract here to refer to, but if it allows you to charge ten per cent. on your advances, I must allow that I made a very foolish arrangement, and that it is for my interest to dissolve the connection as soon as the contract permits. That you may proceed fairly and understandingly, I give you notice, that you must not make any further improvements in the Wight property, without my written assent, and in order to obtain this, you must furnish me with your proposed improvements, and the estimated cost of them. I likewise give you notice, that I shall call for a division of the property as soon as the sales amount to sufficient to cover the advances. This I can do, I believe, according to the contract. I know not what Mr. Marshall may say of your account, but it must readily occur to him, after examination, that the widow's chance of gain is small and remote. Col. Smith is wrong as to Chicago Avenue. I made no agreement with any one. I did not know that Raymond was interested, or that Lee intended making a road on the North Side. Mr. Lee told me he should drain his land by ditching.

Yours respectfully,      A. ROBBINS.

EXHIBIT G.

Know all men, etc., that for and in consideration of $3,000, to me in hand paid, etc., I have this day given, granted, and assigned to said Mahlon D. Ogden, absolutely, all commissions, and all claim and demand I may have to any commissions, upon the proceeds of the sale of the interest of Allen Robbins, in and to a certain tract of land heretofore sold by me to A. Hyatt Smith and John Bradley, etc., etc.

As witness my hand and seal, this 16th day of December, 1858.

W. B. OGDEN. [L. s.]

EXHIBIT H.

(This was a bond of indemnity, given by Mahlon D. Ogden, as trustee for the Chicago Land Company, to Wm. B. Ogden, to save and keep harmless the said William B., from all damages, costs and expenses, which might arise from or grow out of the sale to said company, or to Bradley and Smith, of the land in controversy.)

Agreement of Bradley and Smith:

"Whereas, Wm. B. Ogden, acting for himself, etc., under and by virtue solely of authority vested in said Ogden by an indenture and contract made between, etc., bearing date May 31st, 1847, has this day concluded a sale of all the unsold portions, etc., of the premises named, etc., in such indenture, etc.; and whereas, there was included in said sale, etc., one acre of

ground heretofore contracted by said Ogden, acting for, etc., to Hiram Joy, for $1,500, or thereabouts, said acre being situated, etc. Now it was agreed, in the making of said sale to said Bradley and Smith, between them and the said Ogden, that they should carry out and fulfill the condition of the said contract with said Joy, and upon his making the payment to them, etc., they should make him a proper deed, etc., of the title to said acre, or cause the same to be made to him, his heirs or assigns. The said Bradley and Smith hereby assuming the obligations of said contract, etc., as fully as if made originally by them with said Joy. To all which they bind themselves, etc. November 10th, 1852.

JOHN BRADLEY, [L. S.]
A. HYATT SMITH. [L. S.]

The defendant's proofs, so far as is material, were as follows:

*Judge's certificate.* — This certifies, that at the hearing had before me, Edward A. Drummond was produced as a witness by said defendant, who testified as follows:

"I am deputy clerk of the United States Circuit Court for the Northern District of Illinois. The papers now produced and exhibited by me, are the original bill and answer filed in the United States Circuit Court, in a certain suit in chancery now pending therein, wherein Robert J. Walker is complainant, and Wm. B. Ogden and Mahlon D. Ogden are defendants. I have also certified copies of said bill and answer, which have been furnished at the request of the defendant in this cause."

I further certify, that at the said hearing, John F. Clements was produced as a witness by the defendant, who testified as follows:

"I know Robert J. Walker. The signature of Robert J. Walker to the original bill filed in the suit *Robert J. Walker* v. *Wm. B. Ogden and Mahlon D. Ogden,* pending in the United States Circuit Court, which is now here exhibited to me, is his genuine signature. He signed and made oath to said bill before me, as United States Commissioner."

I further certify, that the signatures of William B. Ogden and Mahlon D. Ogden, to their answer above referred to, were admitted to be genuine.

Whereupon, the counsel for defendant offered the said bill and answer as evidence in this cause.

To this evidence the counsel for complainants objected as incompetent. This objection was sustained by the court, and the evidence was rejected. To this decision the defendant excepted.

The certified copies of the said bill and answer above referred to, were then put on file in this cause, and it was agreed

by counsel that the said copies should for every purpose connected with this case be .held and considered as of the same force, competency and effect as the original bill and answer, for which they are by consent substituted.

I further certify, that the motion by defendant to suppress the depositions of John Bradley and George Steele, was overruled by the court, and to this decision defendant excepted.

I further certify, that by agreement, a certified copy of a certain agreement, dated September 3rd, 1851, signed by John Bradley, E. F. Johnson, J. B. Macy, A. H. Smith, R. J. Walker, and William Sloan, and attached to the deposition of S. H. Fleetwood, filed in the case of *Walker* v. *Ogden et al.*, in the United States Circuit Court, was introduced and read in evidence by said defendant, and the signatures thereto were admitted to be genuine.

GEORGE MANIERRE,    [L. S.]

*Judge 7th Judicial Circuit of Illinois.*

Bill of complaint in the suit, *Robert J. Walker* v. *William B. Ogden and Mahlon D. Ogden*, pending in United States Circuit Court. Filed June 5th, 1855:

[This was a bill filed by Mr. Walker, as one of the shareholders in the Chicago Land Company, against the defendants, as the trustees of said company, to compel them to deliver to him a certificate for 166 shares of stock, which the trustees claimed he had forfeited, by the non-payment of an assessment made upon him, as one of the shareholders, July 19th, 1853, for $4,166.66. It is set forth in the bill, and admitted in the answer, that Mr. Walker was an original subscriber for 1,500 shares—that he had paid for and received a certificate for 200 shares—that he would have been entitled to certificates for the remaining 1,300 shares, upon payment of future assessments, a certificate of one full paid share to be issued for every $25 that should be paid. It was insisted by the trustees, that in consequence of the non-payment of the above assessments, Mr. Walker had forfeited the 166 shares which he would have been entitled to receive a certificate for, had he paid the assessment, as well as all his stock, in the company, except the 200 shares for which a certificate had been issued. (See pages 226, 230, 271, and 305, of the record.) It was claimed by Mr. Walker, that there had been no legal forfeiture, and that on payment of the assessment, which was tendered, he was entitled to his certificate for 166 shares. Another object of the bill was to enjoin the sale of some of the company's lands, which had been advertised by the trustees. Only such portions of the bill and answer as are supposed to be material in this case appear in the abstract.]

To the Hon. Thomas Drummond, Judge, etc., Robert J. Walker, of, etc., brings his bill against William B. Ogden and Mahlon D. Ogden, of, etc. And thereupon your orator complains, and says, that early in the summer of 1851, your orator being convinced, from the extension of railroads and other causes, of the great enhancement that must take place in the value of real estate, in and near the city of Chicago, suggested the formation of a company to purchase land there—in consequence of which suggestion, preliminary articles of association, dated September 3rd, 1851, providing for such purchases, were drawn up by your orator, and signed by him and by John Bradley, Edwin F. Johnson, John B. Macy, A. Hyatt Smith, and William Sloan; that on or about the 9th day of May, 1852, in further progress of said original plan of your orator, William B. Ogden, John P. Chapin, John B. [Macy, A. Hyatt Smith, William Sloan, John Bradley, Jacob P. Eastman, Edwin F. Johnson, Albert A. Bliss, Wm. B. Hotchkiss, and your orator, mutually associated themselves together, for the purpose of procuring and purchasing divers tracts of land, etc., in and about the city of Chicago, for the joint benefit and advantage of the said several persons last above named, according to their respective rights and interests in the premises—which said lands, etc., it was then and there agreed should be held in the name or names of one or more of the said several persons, as trustees, for the benefit of the whole, according to their respective interest therein as aforesaid, for the purpose of facilitating the operation of said association; that subsequently, said association contracted to purchase, and did purchase, certain tracts and lots of land in or near the city of Chicago, which are more particularly described in a certain indenture of agreement, bearing date the 2nd day of May, 1853. (The bill then goes on to recite the articles of association of the Chicago Land Company, executed May 2nd, 1853.)

\*       \*       \*       \*       \*       \*       \*

And your orator further avers, that per exhibit heretofore referred to, it appears, and such was the fact, that said Wm. B. Ogden, under the articles before referred to, of 9th of May, 1852, was an original shareholder; that said trustees reserved the right to purchase shares under the present articles, and from said facts, your orator believes are large shareholders, etc., etc.

The foregoing bill is sworn to by the complainant, June 5th, 1855.

The joint and several answer of Wm. B. Ogden and Mahlon D. Ogden to the above bill. Filed June 9th, 1856:

These defendants now, and at all times hereafter, saving and reserving, etc., for answer to said bill, each answering for him-

27

self, and not one for the other, jointly and severally answer and say,

That they are wholly ignorant whether the statement made in said bill, that the said complainant was convinced that a great enhancement in the value of real estate would take place in the city of Chicago, is true or not, and have no information on the subject, and they are also ignorant, nor have they any information whether the said complainant suggested the formation of a company for the purchase of land in said city, as alleged in said bill, and they are unable positively to state whether such statement is true or not, but according to their best knowledge, information and belief, the said statement is not true.

And these defendants further answering, the said Wm. B. Ogden for himself, and the said Mahlon D. Ogden from information derived from the said Wm. B. Ogden, admit that on or about the 9th day of May, A. D. 1852, the said complainant was associated with Wm. B. Ogden and the other persons named in said bill, for the purpose of procuring and purchasing divers tracts of land and property in and about the city of Chicago, as is alleged in said bill. 　　*　　*　　*　　*　　*

And these defendants, further answering, deny that the said Wm. B. Ogden was an original shareholder under the articles of the 9th of May, 1852, and aver that neither of these defendants ever purchased any shares whatever, never owned any shares under said articles of association, and never held any in their own names, except as collateral security, and as to the rights of said trustees, under said articles of association, reference is hereby made to the said articles, etc., etc.

The answer is signed, but not sworn to, by Wm. B. Ogden, and Mahlon D. Ogden. (It nowhere appears in said answer, that Wm. B. Ogden had resigned his office as trustee.)

Agreement between R. J. Walker and others, dated September 3rd, 1851:

" Whereas, the Illinois and Wisconsin Railroad Company have made certain contracts for the building of their road, from, etc., to the city of Chicago, and thence to the State line of Indiana; and whereas, said company propose to locate one of their depots in the said city of Chicago, which, etc., will give great value to the property in Chicago, near to said depot, etc. ; and whereas, it is proposed to purchase said lands thus believed to be appreciated in value, etc. : Now it is understood, that as far as practicable, said lands will be purchased for the joint and equal benefit of the following persons, ten in number, and each holding one equal undivided tenth part of the same, and each contributing one-tenth part of the purchase money therefor, as hereafter stated, which said ten persons are the

following seven persons, namely: John Bradley, Jacob P. Eastman, E. H. Johnson, John B. Macy, A. Hyatt Smith, R. J. Walker, and Wm. Sloan, and the others to be selected as hereafter stated; and whereas, it is contemplated that certain of the ten persons, etc., will contribute the cash toward the payment of purchase money, etc., charging interest, etc., which said cash advances and interest, etc., is to be refunded within two years thereafter, etc.; and whereas, seven of the parties to this contract have subscribed the same, it is agreed the remaining three shall be selected by R. J. Walker, such persons being contemplated, as from their capital or influence, it is deemed by him, would contribute most to the success of this enterprise; and it is further agreed, that said lands thus proposed to be purchased shall be such, as to price and location, as are first approved or selected by John B. Macy and A. Hyatt Smith, etc., they being limited to a sum for the entire purchase not exceeding $300,000, nor at a distance more remote than four miles from the depot of the Illinois and Wisconsin Railroad Company, which depot is to be selected by said Smith and Macy, and the land purchased by them at the best rates, to an extent of about twenty acres, and which they shall set apart out of the purchased property, and to be paid for by said Illinois and Wisconsin Railroad Company, at the price given, or agreed to be given, by said Smith and Macy; provided also, that if said Walker can procure one person to make said advances, said person shall hold three-tenths interest in said lands, or if two persons, said two persons shall hold three-tenths, etc., it being also understood, that for such advances, etc., said Smith and Macy shall transfer said lands, etc., as a security to the party making said advances, and for further security, each of said several parties, etc., to this contract, shall execute his note for his tenth part of the purchase money advanced, etc., made payable in two years, as aforesaid, and notes for the remaining seven-tenths, payable when the remainder of the purchase money is to be paid, etc.

"*New York, 3rd Sept.*, 1851.
JOHN BRADLEY.
EDWIN F. JOHNSON.
JOHN B. MACY.
A. HYATT SMITH.
R. J. WALKER.
WM. SLOAN."

Deposition of *Augustus Frisbie*, taken March 29th, 1859:

I reside in Chicago. Am forty years of age. Engaged in the ice business.

In 1852, I was associated in business with Hiram Joy.

In connection with Mr. Joy, I negotiated a trade with Mr. Ogden, which was consummated July 22nd, 1852. The first negotiations were had some two or three weeks before—about

the first of July. Some time elapsed in consequence of my opposing the trade. I had no interest in the purchase. The contract hereto attached, " A," is the original contract signed by the parties. The price was $1,500, on canal time. I would not consent to the purchase until Mr. Ogden extended the time of the first payment. He extended it as expressed in the contract.

Mr. Ogden changed the terms of payment to meet our views, but added $25 to make up the difference in interest on account of extending the first payment.

My recollection is, that Mr. Ogden said about that time that he did not want to sell any more at that price — that it was cheap. He bound us to erect buildings, as appears by the contract. I saw no reluctance on his part to sign the contract and let Joy have the land.

I have not the most remote recollection that anything was said by Mr. Ogden, during the negotiations, about any previous sale of this land to other parties. It is among the bare possibilities that something of the kind may have been said, but my memory is good, and had there been any such conversation I think I should remember it, and I should, according to my custom in such cases, have noted it on the contract, or made some memorandum of it. For the last ten years, I have kept a record and account of all of Mr. Joy's real estate transactions, and have had the general supervision of all his real estate matters, and contracts of all kinds.

On the first day of June, 1853, $603.28 was paid to Ogden, Jones & Co., and their receipt was indorsed on the contract which Joy holds, (a duplicate to the one hereto attached.) On the first of Deccember, 1854, $560 was paid, and receipt taken as above. On the 7th of November, 1855, $584.18, the balance due, was paid, and receipt taken.

The paper hereto attached, marked " B," is a deed of the same property, signed by Mr. Ogden. I know his signature. Mr. Joy told me that Mr. Ogden handed this deed to him, and that he handed it to Mr. Robbins to be executed, and that he declined.

At the time this land was sold, the contract price was all it was worth. It is now worth about $10,000.

I should judge that the whole of Wight's addition was at that time worth $500 an acre. That portion along the river was worth $25 a foot. That is what I could have sold it for, for cash, at that time.

*Cross-examination.* — I was a party to the negotiations for this land from first to last. My impression is, that the first conversation took place between Ogden and Joy.

o

There was no agreement upon the terms of the contract until they were agreed upon, between Ogden, Joy and myself. The price had been fixed between Ogden and Joy.

The terms of payment were agreed upon at the date of the contract — it might have been a day or two before.

I recollect that the terms were agreed upon at that time, and might have been a few days or even weeks before.

It is my best recollection that it was not more than two or three days, but it might have been two or three weeks, it could not have more than that at the outside.

I knew nothing of any sale or negotiation of sale of the whole Wight property.

I never applied to Mr. Robbins for the purchase of this property.

Deposition of *Franklin Hathaway*, taken March 30th, 1859: Reside in Chicago. Am a clerk.

I was engaged in the office of Ogden, Jones & Co., while that firm was in business, as book-keeper and cashier.

I was in the service of Ogden and Jones prior to that, for over three years. The firm of Ogden, Jones & Co., was formed July 1st, 1850. It was changed Nov. 1st, 1855, to Ogden, Fleetwood & Co. I have been in their office ever since.

The business of the concern continued to be managed as though no change in the firm had been made.

Ogden, Jones & Co. assumed the supervision of the Wight property, and kept and rendered regular accounts of sales, disbursements, etc., up to the time of the pretended sale to Bradley and Smith.

I cannot state positively whether Mr. Robbins was indebted to the firm on account of their disbursements for this property, at the time of said sale. My recollection is, that Mr. R. was in the habit of advancing his proportion every six months — so as to keep up with the advances made by Mr. Ogden — but the property was largely indebted for disbursements and advances on its account, at the time of the sale.

I think no change took place in the management of the business relating to this property, in consequence of the death of Mr. Jones. Accounts were made out and rendered to Mr. Robbins by the surviving members.

The account attached, and marked " Exhibit A," was made by me. I presume it was rendered to Mr. Robbins. I believe they were ordinarily made out in this way.

The papers attached, marked " B," " C," and " D," are in the handwriting of clerks in the office. I presume they relate to this Wight property.

I believe the sale to Bradley and Smith embraced all the Wight property then remaining unsold.

I think there was a commission of ten per cent. charged upon Ogden, Jones and Co.'s books for this sale. (Objected to.)

Do not know whether Mr. Ogden has drawn his share.

Mr. Robbins has never drawn any portion of the proceeds of that sale, to my knowledge. My impression is, that he has not.

I have no distinct recollection of the letter from Mr. Robbins to Mr. Ogden, dated August, 1852. I cannot swear positively whether I ever saw the letter or not.

It is impossible for me to recollect any particular letter among the thousands that come to the office. I may have seen this letter, but I have no recollection of it.

I have no recollection as to what occurred about the date of that letter in relation to the sale of the Wight property.

At the time of the sale I think I knew nothing about any instructions given by Mr. Robbins.

I cannot say that I had any knowledge of Mr. Robbins being opposed to the sale. I do not know of Mr. Ogden having taken legal advice about it.

I mean to be understood, that at or about the time of said sale, I had no knowledge on the subject referred to.

I cannot fix upon the precise date when I learned that Mr. Robbins was opposed to the sale, but think it was at or about the rendering of the February semi-annual account of 1853.

I do not know whether any discussion was had between Mr. Ogden, and Bradley and Smith, as to his authority to make the sale.

Edwin H. Sheldon was a member of the firm of Ogden, Jones & Co., through the summer and fall of 1852.

Sheldon was not, I think, a member of the Chicago Land Company.

I do not know whether Wm. B. Ogden made any purchases for the Chicago Land Company in 1852.

Neither Mr. Ogden or his firm bought the Elston property for said company, to my knowledge.

*Cross-examination.*—The Wight property was indebted, at the time of the sale to Bradley and Smith, for advances, to the amount of about $8,500, perhaps a little less.

Ogden, Jones & Co. kept the accounts and managed this property under the direction and control of Wm. B. Ogden.

There was a sale of a lot in the Wight property to Hiram Joy, in July, 1852. The Chicago Land Company got the benefit of the purchase money.

The first money received on that contract was credited to the Wight property on the books. Soon after the entry was

made, it was ascertained that this lot was a part of the Chicago Land Company's purchase. The entry was then changed by charging the amount entered in error back to the Wight property, and crediting the amount to the Chicago Land Company. The money was received and credited in the latter part of May, 1853, and the entry corrected the latter part of June following.

I should think that the paper attached to Wm. B. Ogden's deposition, marked " Exhibit E," was a transcript of the sales-book, where the sale is noted. The contract appears in the name of Ogden and Robbins, because at that date the legal title to the property was, as I suppose, in their name. The only indication upon the paper, as to what account in the books received credit for the moneys noted therein, appears in a note at the foot of the statement, setting forth that the money was received for the Chicago Land Company.

I was not sufficiently acquainted with the value of real estate here in 1852, to make my opinion of much value.

*Direct examination resumed.*—The time referred to in my statement about the indebtment of $8,500 of the Wight property, is the 1st of August, 1852.

This debt was contracted for taxes and improvements. Mr. Robbins had, I believe, up to that time, advanced his proportion, but the property was then indebted in the amount named.

The amount received from Joy went to the credit of the Chicago Land Company, in the same manner as receipts for other property sold for them.

The paper attached, marked " E," is an account respecting the Wight property, rendered by Ogden, Jones & Co., to Mr. Robbins, Feb. 1st, 1853.

The paper attached to Wm. B. Ogden's deposition, and marked " Exhibit F," is a letter purporting to be written to Ogden and Jones, and I recognize on the back of it an indorsement in the handwriting of Mr. Jones. I conclude from this that it was received by them.

The following were exhibits attached to Mr. Frisbie's deposition :

### Exhibit A.

Articles of Agreement, made, etc., the 22nd day of July, 1852, between Wm. B. Ogden and Allen Robbins, by Wm. B. Ogden, his attorney, of the first part, and Hiram Joy of the second part, Witnesseth, that the party of the first part, in consideration, etc., hereby agrees to sell to the party of the second part, all that certain lot, etc., known, etc., as part of the E. $\frac{1}{2}$ of S. E. $\frac{1}{4}$ of Sec. 5, T. 39 N., R. 14 E., bounded, etc., containing about one acre. And the said party of the second part hereby agrees to pay to said party of the first part, at the office of Ogden, Jones & Co., in Chicago, the sum of $1,525, as follows : $525, June 1st,

1853; $500, June 1st, 1854; $500, June 1st, 1855, with interest annually, etc.; and that he will pay all taxes subsequent to the year 1851, and all assessments, etc. The party of the second part further agrees that he will erect good and substantial buildings on said premises by the first of December next, worth at least $1,000, which shall remain thereon, etc.

(Here follow covenants for a deed, etc. etc.)

In witness whereof, the party of the first part, in person and by attorney, and the party of the second part, in his own proper person, have hereunto set their hands and seals, etc.

WM. B. OGDEN.          [L. s.]
ALLEN ROBBINS,          [L. s.]
By W. B. OGDEN, his Attorney.
HIRAM JOY.          [L. s.]

### EXHIBIT B.

(This is a deed of conveyance of the premises described in the foregoing contract, bearing date February 29th, 1856, in which the grantors mentioned are William B. Ogden and Allen Robbins, and Hiram Joy is grantee. The deed is executed only by Wm. B. Ogden.)

The following were exhibits attached to the deposition of Mr. Hathaway:

### EXHIBIT " A."

(This is an account with the Wight property, from February 1st to August 1st, 1853, rendered by Ogden, Jones & Co., August 1st, 1853, and commencing as follows:

"THE WIGHT PROPERTY,
          In account with Ogden, Jones & Co., successors to Ogden & Jones.")

### EXHIBITS " B," " C," AND " D."

(These are other accounts with the same property, from August 1st, 1854, to February 1st, 1856, rendered by Ogden, Jones & Co., and commencing as follows:
" WIGHT PROPERTY,
          In account with Ogden, Jones & Co., survivor and successors of
               Ogden & Jones.")

### EXHIBIT " E."

(Another account with the same property, from August 1st, 1852, to February 1st, 1853, rendered by Ogden, Jones & Co., February 1st, 1853, and commencing as follows:
" THE WIGHT PROPERTY,
          In account with Ogden, Jones & Co., successors to Ogden & Jones."

This statement contains a credit of $25,000, under date of Nov. 11th, 1852, received from Bradley and Smith, first payment on their contract, and a debit of $10,000, under date of Jan. 31st, 1853, for ten per cent. commissions upon the sale to Bradley and Smith.)

Stipulation, admitting that the letter of March 4th, 1848, from Allen Robbins to Ogden and Jones, attached to Wm. B. Ogden's deposition, and marked " Exhibit F," and that the

letter of Aug. 27th, 1852, from said Robbins to Wm. B. Ogden, attached to said Ogden's deposition, and marked " Exhibit C," were written and received at or about the times they bear date.

Decree rendered May 2nd, 1859, that the agreement of Nov. 10, 1852, set forth in the pleadings, be carried into execution, and that said defendant execute and deliver to Mahlon D. Ogden, trustee of the Chicago Land Company, within thirty days, a deed of conveyance sufficient to convey the legal title to an undivided half of the premises in question. And in case of his refusal to execute such conveyance, the master in chancery shall make and deliver a deed, etc. And it is further ordered, by consent of the parties, that the parties shall have all the benefit of their exceptions to the several rulings of the judge, noted in the judge's several certificates, as fully as if the same were embodied in this decree, and defendant to pay costs, etc.

Defendant excepts to the decree, and prays for an appeal.

Appellant assigns for error,

1st. The court below erred in admitting and considering the testimony of John Bradley, George Steele, and Edwin H. Sheldon.

2nd. The court below erred in excluding from this case, as evidence, the bill and answer in chancery, in the suit of *Robert J. Walker* v. *William B. Ogden and Mahlon D. Ogden.*

3rd. The court below erred in decreeing a specific performance of the contract referred to in the bill.

4th. The court below ought to have rendered a decree dismissing the bill.

STUART & AYER, for Appellant.

BECKWITH, MERRICK & CASSIN, for Appellees.

BREESE, J. We have devoted all the time at our command to the examination of this record, the errors assigned upon it, and to the arguments submitted by counsel, and have arrived at the conclusions we now proceed to state.

As to the first error assigned, objections to the competency of a witness are not now regarded by courts with as much favor as in former times, their credibility, under all the circumstances, being left to the jury trying the case. In chancery proceedings, where the court alone hears the testimony, the same rule ought to obtain. It is a settled principle, that an interested witness can restore his competency by showing that although at one time he was interested, he had, in good faith, divested himself of that interest, and that, too, in order to make himself a witness. This is every day's practice. The good faith with which the

act is done, is for the court to scrutinize, under the circumstances.

As to Ogden, it will be noticed, that his deposition was excluded by the court, and no point can be made on that now, as the appellees have not leave to assign cross-errors. As to Sheldon, his transfer of his share in the commissions to which his firm would be entitled, if made in good faith, of which the court was to judge, restored his competency in that regard, but in another respect, it was not restored, against which his transfer could have no effect or operation. In case the complainants fail in the suit, this witness, as a member of the firm of Ogden, Jones & Co., is responsible to the complainants, for the interest on the money they have paid into the hands of this company on appellant's third, and which alone the complainants could release, but which they have not released. He then had an existing and a direct interest in the event of this suit, notwithstanding his transfer of his commissions, in the shape of this interest, on the money received, for which he would be liable to the complainants. If the complainants prevail in the suit, appellant, by the contract, can claim no interest of the company; the witness' interest, therefore, is that the complainants shall prevail.

Now, as to the competency of Bradley and Steele. They were both shareholders in the stock of the Chicago Land Company, and, as such, partners. There is no evidence that the transfers that they state they made, have ever been registered on the books of the company, as the articles of association require, or that the liability of their transferees has been fixed, by affixing their names and seals to the articles. Until that be done, if that would do, these witnesses could not be released from their liability as members of the association. They, themselves, have provided the mode by which their liabilities can be made to devolve upon others, and to that mode they must be held. But these shareholders have none of the rights or immunities of such, as in a regularly incorporated company. These stock companies are nothing more than partnerships, and every member of the company is liable for the debts of the concern, no matter what the private arrangements among themselves may be, if they have not shifted their liability in the very mode pointed out in the articles of association. They are, therefore, parties to the suit, as complainants. But there is another objection to Bradley. It is shown he was at the time of testifying, a stockholder in the St. Paul and Fond du Lac Railroad Company, which company had obtained from this land association, the right of way for their road over part of this land, one-third of which right they would lose if the appellant

prevails. It is no answer to this view to say, that this was a parol agreement, and void by the statute of frauds and perjuries. It is still binding, notwithstanding the statute, unless the statute be pleaded, and we cannot say that it will be pleaded. Bradley was not a competent witness, for the reasons we have given.

The next error assigned is, to the rejection of the bill in chancery, filed by Robert J. Walker, and sworn to, against W. B. and M. D. Ogden, in the Circuit Court of the United States for the northern district of this State, and their answer to the bill. As the object of offering these files was to get at admissions of a part of those defendants, the Ogdens, to be used in this suit, in which they had a direct interest, we think they should have been received in evidence. The object of the appellant was to show, that in May, 1852, William B. Ogden, who sold the land of appellant in November of that year, was actually a member of the land company buying it. The admissions of a party to a fact, no matter when made or how made, are evidence against him—no matter if they be found in an answer in chancery, in a letter, or proved in some other mode. They are still his admissions, and can be used against him. These files should have been admitted for such purpose.

Having disposed of these preliminary objections, we come now to the important point in the case on its merits, and that is, did the evidence, as exhibited in the record, warrant the court in decreeing a specific performance against the appellant?

Is the contract made with Bradley and Smith, bearing date 10th of November, 1852, binding on the appellant? if it is, the decree on the merits is right, if these preliminaries could be waived.

The parties to the agreement to sell, are William B. Ogden of the first part, and John Bradley and A. Hyatt Smith of the second part, but who really were contracting for the Chicago Land Company, of which W. B. Ogden was a member. The contract recites the agreement of May 31, 1847, under which Ogden's claim to act for Robbins, arises.

It will be observed, that this trust, by this agreement, was not committed to William B. Ogden and William E. Jones, but to the firm of Ogden and Jones, " their survivor and successors in business." The inducement was, undoubtedly, the great reputation this firm possessed as land agents, well acquainted with the value of land in the locality where they operated. As accomplished agents, they were entrusted with the powers by the appellant and Mrs. Wight, acting through her trustee, Mr. Marshall, with a special supervisory power over these lands, subject, however, to the general directions of the appellant and W. B. Ogden, who were joint owners with Mrs. Wight of the

property. Sales were to be made from time to time, of portions of the property, to raise money to make improvements calculated to enhance the value of the property. No interest in the land vested in Ogden and Jones, by this agreement, nor in their survivor or successors. A simple power to make sales and improvements for the purposes indicated, was alone granted, and under the conditions named. As donees of this power, they took no title and could convey none. In executing the power, the stipulations and directions of the agreement should have been faithfully observed.

As to the execution of the agreement in the name of W. B. Ogden, as attorney for Robbins, without the name of Robbins to the deed, it is a clear proposition that at law it is no binding covenant on Robbins, but we are not prepared to say that a court of equity should not recognize it as valid, in the absence of fraud, mistake, or other circumstance casting suspicion upon it.

On another point made by the appellant, we are with him, and that is, the appointees of the power to make a sale of the whole property under the agreement of 31st May, 1847, were not Ogden and Jones only, but they and the survivor of them, connected with their successors in business, for which the agreement amply provided. This power is as follows, in these words: "The said Ogden and Jones, their survivor and successors in business, shall proceed to make sales of said premises, or lease or otherwise dispose of, in part or in whole, when, where and as they shall in their discretion think and deem to be most advantageous and conducive to the best interests of said property, and most beneficial to the results to be realized from the same; such sales, leases, or other disposition of said property to be made at such time or times hereafter, and in such manner, and on such terms, for cash and credit, or in exchange for other property, thing or things, or partly on credit, or partly for payment in hand, or for other property or thing in exchange, as we or our survivor, executors and administrators, or the said Ogden and Jones, their survivor and successors in business, in Chicago, shall, in our or their discretion, think to be most advantageous to said property, and best calculated to enhance the amount to be derived therefrom."

For other purposes, not extending to a sale of a part or the whole property, the disjunctive "or" is used, but when a sale is named of the property, in whole or in part, the conjunctive "and" is used, coupling the successors of Ogden and Jones with them or their survivor. When this agreement was made, William B. Ogden and William E. Jones composed the firm of Ogden and Jones, and it so continued until the first of July,

1850, at which time they associated with them Mahlon D. Ogden and Edwin H. Sheldon, and changed the style of the firm to Ogden, Jones & Co. These parties were then the successors in business of the old firm of Ogden and Jones, and this agency, by the true meaning of the terms of the agreement, devolved upon the new firm. The old firm no longer existed, but became merged in the new. The agreement or indenture shows clearly, that it was never in the contemplation of the parties to it, that the business of the agency should be committed to two distinct and independent firms or parties at the same time. It makes no provision for the concurrent exercise of the power by different parties, but confides it to a single party or firm.

There can be no doubt about this, nor can there be any doubt, from the language employed, that the parties contemplated that the agency should pass to the new firm, in case one was established. And we see the fact to be, that on the establishment of the new firm of Ogden, Jones & Co., the agency was actually carried on by this new firm, and they, therefore, were the only proper parties competent to transact its business. This agency was one and indivisible, Ogden having no power, of himself, and by himself, to make sales of the property, committing other parts of the agency to his associates. There is no such idea in the deed. It follows, then, that under this deed, the power to make sales was, in November, 1852, vested in the Ogdens and Sheldon jointly, they having equal power, interest and authority with respect to this property, and unauthorized to act separately.

In answer to this view, it is contended by the appellees, that, though the power of sale was reposed in Ogden, Jones & Co., it was not necessary that they should all actually join in the sale, their concurrence, verbal or otherwise, being sufficient. We will not say this might not be, but the testimony on this point, being out of the record, can have no bearing on the case, and but very little, if it was in the record. It has relation to a period months anterior to the actual sale of the property, and when, in that locality, property was not on the rise, or if so, but moderately. And there is strong evidence, in the acts of W. B. Ogden himself, showing that their negotiations for a sale had terminated unsuccessfully, or had been abandoned. One strong fact is, that on the 22nd of July, 1852, W. B. Ogden executed, in the name of himself and appellant, for the consideration of fifteen hundred and twenty-five dollars, a contract for the sale of one acre of this very property. The facts about the sale are fully stated by Mr. Frisbie, who made the contract on the part of Joy, and he states that the negotiations for this acre

commenced about the first of July, and that not a word was
said by Mr. Ogden about any previous sale, or contract of sale,
or negotiation for a sale of the whole or any part of this
property to other parties; and Joy testifies that Mr. Ogden
said nothing to him about any sale to Bradley and Smith, and
that he had no knowledge or intimation of any such sale.  The
explanation of this given by Mr. Ogden is not satisfactory, if his
deposition, which was ruled out, could be regarded.  He states,
as his recollection, that this contract with Joy was made pend-
ing the negotiations with Bradley and Smith, and that they
were to consummate it with Joy.  This hardly tallies with his
previous statement, that the negotiation with these parties,
Bradley and Smith, was *concluded* about the fifteenth of June,
and that he gave them a few days to raise the money for the
first payment.  Now, as the negotiation for the sale to Joy did
not commence until about the first of July following, which
interval Ogden had given to Bradley and Smith to raise the
money for the first payment, as Ogden says, is it not more than
surprising, that Ogden should not have mentioned that he had
actually concluded a contract for the whole property weeks
previously, and sent Joy to his vendees to purchase?  And
could the contract with Bradley and Smith have been pending?
Which statement is the true one?  A negotiation cannot be
pending and concluded at the same time.  As the statements
stand in the deposition they are irreconcilable, and being so,
furnish strong persuasive evidence that the contract contem-
plated with Bradley and Smith had been abandoned before the
sale to Joy.

There is another fact tending strongly to show that no con-
tract of sale was concluded in June with Bradley and Smith,
and that is, in the semi-annual statement of sales and expendi-
tures rendered by this agency to appellant on the first day of
August, 1852, there is no hint, memorandum, note or mention
of any such sale.

In a sale of such magnitude, the constituent should have the
earliest intelligence, that he may make inquiries about it, and
how strange it is, when it is shown that the appellant was in close
proximity to his agents, to be seen and counselled with at any
hour of the day, that not one word should have been spoken to
him about such a contract, and his opinion solicited.  Mr. Ogden
says, he did advise Mr. Bradley to see Mr. Robbins, on the
ground of *courtesy* merely, not doubting, however, his power to
sell independently of him.

An agent, devoted to the interests of his client, has more to
do with justice than the empty and idle ceremonies, courtesy
may impose, or good manners inspire.  Even if he had the

power to sell, independently of the appellant, and without consulting him, did not duty, not courtesy, to his client, require him to see him, and have a full, free and friendly consultation with him as to price, terms, the state of the money market, the expected increase in value, for land was then going up—in short, upon every topic connected with the property and its sale? The proper construction of the deed of 31st May, and its purposes, contemplated as much. The agency of this house was adopted as a mode of selling—as a convenient mode—not as giving the agency any title to dispose of its property at their whim and caprice, but upon consultation with the proprietors, if they were within convenient reach. No title was conveyed, but the joint judgment of all the parties, as to its management and sale, was designed to be secured.

But above all, how remarkable it is that appellant's letter of the 27th August, 1852, should have had no effect upon the active agent in effecting this sale. The letter was written, evidently, under considerable excitement, and even if the pretensions set up in it were unfounded, it should have checked the consummation of any sale, or contract, not legally binding on the parties, until a consultation, at least, could have been had. At any rate, it deserved a reply, conveying the information that a contract had already been concluded with Bradley and Smith as now here set up, for the sale of the whole property, so that the appellant, while it was executory merely, might have availed himself of all his legal rights, and prevented its consummation. In that letter, the agent is distinctly advised, that his constituent had lost all confidence in his integrity, and is expressly forbidden to make any sales exceeding in amount the advances, or any sale as to which he is not consulted, and to which he does not give his assent; and he complains that no report had been made to him of the sale to Joy.

We cannot but think, even if the pretensions of the writer were unfounded, this letter should have checked the further progress of any sale, the preliminaries of which, had been canvassed months before, when the fact was patent, that during this interval, this property had risen greatly in value, not only partaking of the general stimulus to property in the city of Chicago, but of one local to itself—the construction of the Fond du Lac Railroad, whose depot was established in close proximity to it. By the testimony of Mr. Burch, these causes operated to double the value of the property over the sum it was worth in June, when Bradley and Smith had talked of buying it, and when appellant had put the price at the sum for which it was then proposed to be sold to them. It does seem that all these circumstances should have admonished the active agent, that in

disposing of this property, he was, perhaps, doing great injustice to the appellant, and to Mrs. Wight, and that a free consultation with appellant about it, was alike demanded by justice, as well as courtesy.

Whilst this property was growing in value, which a speculator such as Mr. Bradley could not fail to perceive, and desire to profit by, he visits the city of New York, and there consummates a sale on the 10th of November, with Mr. Ogden, of the whole of this property, at the June price of one hundred thousand dollars, though then worth, if we can believe the witness, more than twice that sum. In fact, when the negotiations in June and July were going on, it appears that one acre of it was sold to Joy, for more than fifteen hundred dollars, which, at this rate, would make the whole property worth at that time, in acres, more than three hundred thousand dollars. To this sale, the assent of his copartners was not had—they were not consulted about it, but by the contract itself, Ogden acted as the surviving partner of Jones alone, and what is remarkable, the contract does not allude or refer to any previous verbal sale or contract.

From the fact that W. B. Ogden was a member of the Chicago Land Company, in its inception under another name, as early as May, 1852; that about that time the associates forming this company, commenced the purchase of lands with a view to their rise in value; that Bradley and Smith were members of this company, and their purchases were to go to the benefit of this company, and so known to their associate, Ogden; that he, in selling to them, was, really, selling to himself, or to an association of which he was a member; the sale was void, on the well-known principle that a trustee cannot be the purchaser, directly or indirectly, of the property or estate entrusted to him to sell. We can come to no other conclusion, on all the facts of this case, than that this sale was not made by appellant or by any agent as contemplated in the indenture of May 31, 1847—that it was made in defiance of appellant's remonstrances. Ogden was himself a purchaser as well as vendor. He was a member of the land company to whom he sold the land, and all his associates are chargeable with the same considerations which would bear upon him were he solely interested as purchaser. There is nothing in the character of the case that we can discover, recommending it to the favorable consideration of a court of equity, and nothing to justify such a court in decreeing a specific performance of the contract set up, on which the bill is founded. We see nothing in the case, giving a claim to be heard in equity, and we must reverse the decree below, and dismiss the bill.

*Decree reversed.*