## John Erwin McDowell et al

### v.

## John K. Joice et al.

*Real Property—Partnership for Dealing in—Fraud.*

Upon a bill filed by some of a numerous body of shareholders of an association formed for the purpose of speculating in real estate, to enforce a common benefit against several of their associates specially charged with fraud, certain lands having been bought for a much less sum than that at which they were turned over to the association, this court holds that the scheme to buy such lands through an intermediary

and turn them over at an increased price was a fraud upon the members of the association who joined in the purchase; that the parties to the fraudulent scheme were trustees; that the notes secured by trust deed covering such difference in price should be given up and canceled and the trust deed released, and that the distribution of the fruits, by way of money, of the decree, is a question for which the court would always be open.

[Opinion filed January 7, 1893.]

APPEAL from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding.

Messrs. PENCE & CARPENTER, for appellants.

The Supreme Court of this State, as do other courts, hold that a man may lawfully contract to sell a tract of land before he gets the title thereto, and may enforce a specific performance of such contract. The only thing necessary is that he should have the title when the time for performance comes. Merryman v. David, 31 Ill. 404; Dressel v. Jordan, 104 Mass. 407; Rutland v. Blister, 53 Miss. 683–686; 2 Story, Eq. Jur., Sec. 777.

In Rutland v. Blister the court says:

"A person may bargain to convey land to which he has no title, legal or equitable. When the time for performance comes, he fulfills the obligation if he induces him who has the title to convey to the vendee."

Mr. Martin has performed his contract. He owed no duty to appellees when he contracted with them to sell to them. He was not a member of their association. He was not their agent and never had been.

Appellees have no right to make an inquiry as to how Martin expected to pay for the property, or as to whom he expected to sell it when he contracted with Lewis, or as to whether he expected to sell same to appellees. They are not interested in any such inquiry. Martin owed them no duty. He had a right to purchase and to sell of whom and to whom he might choose without permission from appellees.

Martin, and Gilliland and McDowell under him, became

interested in the premises in question, before the second syndicate or association was formed; and although Gilliland and McDowell became members of the second association subsequently, they had a right to sell the property to the association of which they became members, at any price that might be agreed upon between them, no matter what it may have originally cost.

No fraudulent misrepresentation was made by Martin, Gilliland or McDowell. Maggs and his associates did not rely upon any representation made by them. Martin, Gilliland and McDowell were in no sense agents or trustees in the original purchase of Lewis, because the second syndicate did not then have an existence, and they afterward dealt with the second syndicate at arm's length. There is not a single allegation of fraud in the bill, or proof in the evidence, showing that either of these gentlemen made any fraudulent representation of any kind whereby the syndicate was induced to purchase. Densmore Oil Company v. Densmore, 64 Pa. St. 43.

The opinion in that case was delivered by Sharswood, J., in the course of which he said:

" There are two principles applicable to all cases of partnerships or associations for a common purpose of trade or business, which appear to be well settled on reason and authority.

" The first is that any man, or number of men, who are the owners of any kind of property, real or personal, may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there be no fraudulent misrepresentation made by the vendors to their associates. They are not bound to disclose the profit which they may realize by the transaction. They were in no sense agents or trustees in the original purchase, and it follows that there is no confidential relation between the parties which affects them with any trust. It is like any other case of vendor and vendee. They deal at arm's length. Their partners are in no better

position than strangers.    They must exercise their own judg-
ment as to the value of what they buy.    As is succinctly and
well stated in Foss v. Harbottle, 2 Hare, 489, ' A party may
have a clear right to say, "I begin the transaction at this
time.    I have purchased land, no matter how or from whom,
or at what price.    I am willing to sell it at a certain price
for a given purpose." '

"The second principle is, that where persons form such
an association, or begin or start the project of one, from
that time they do stand in a confidential relation to each
other, and to all others who may subsequently become mem-
bers or subscribers, and it is not competent for any of them
to purchase property for the purposes of such company, and
then sell it at an advance without a full disclosure of the
facts."

The facts in this case bring it clearly within the first prin-
ciple mentioned by Justice Sharswood.    The evidence shows
that whatever interest Martin had in this property, or what-
ever interest Gilliland and McDowell had, if they had any,
was obtained by purchase from Lewis before there were any
negotiations for the sale of it to the syndicate in question,
and before the syndicate in question had an existence, or
was in contemplation.    It is true that the evidence of the
interest so obtained by Martin was not signed by Lewis
until the day that the new syndicate accepted the offer of
Martin to sell the same to it, but in this case there was no
representation of any kind that either of these appellants
would act as the agent of the syndicate, or obtain the prop-
erty in question for the syndicate at the original cost price,
but all that was said and done was that Mr. Gilliland offered
them the premises in question at a certain price, as the rep-
resentative of Mr. Martin, who had before that time acquired
an interest from Mr. Lewis.    No representation was made
by any of the three persons to the syndicate as to the value,
or as to the original cost of the land, whereby they could be
misled, and there was no suppression of any fact that the
syndicate was entitled to know.

The association depended upon the judgment of their own

officers and did not authorize Martin, Gilliland or McDowell to buy the property for them.  They bought this property of Martin, and not through Martin, Gilliland or McDowell, as agents of the association, and hence there was no confidential relation and no fraud in fact.

The association dealt with Martin as principal, and not as agent.  Neither Martin, Gilliland nor McDowell promised the association to buy for them, but they dealt at arm's length.  And the association and its officers did not place any trust or confidence in Martin, nor in Gilliland, nor McDowell, in making such purchase.

As Judge Sharswood said in the Densmore case :

" Any man or number of men who are the owners of any kind of property may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there is no fraudulent misrepresentation made by the vendors to their associates."

The only exception is that there should be no fraudulent misrepresentations.  That is, there must be an actual fraud to render the contract impeachable, not a constructive fraud. An attorney may sell to his client, or agent to his principal, or a shareholder in a corporation, and even an officer, to his corporation, and a member of a firm to his firm.

All such contracts are binding, unless the persons occupying such fiduciary relations are guilty of an actual fraud. Densmore Oil Co. v. Densmore, 64 Pa. St. 43 ; Whitman v. Bowden, 27 South Carolina, 53, 60 ; Merrick v. Peru Coal Co., 61 Ill. 472 ; 1 Morawetz on Cor., Sec. 521.

I need not refer again to the language used by Judge Sharswood in the Densmore case.

In Whitman v. Bowden, the court said :   " The mere relation of partners does not forbid a contract by one partner with the firm, and such contract, if *bona fide* and free from fraud, will be sustained."

The Supreme Court of Illinois in Merrick v. Peru Coal Co., said :   " There is no rule which prohibits a shareholder

from dealing with the company." In 1 Morawetz, Cor., Sec. 521, the author says :

" A director or other agent of a corporation may deal with a company, provided it be adequately represented by other agents ; he may also purchase property and afterward sell it to the corporation at an advance, provided it was not his duty when he made the purchase to purchase on behalf of the company. So an agent of a corporation may purchase claims against the company at a discount and enforce them in full, if he be not under obligation to make the purchase on behalf of the corporation."

Neither Martin nor Gilliland nor McDowell were under obligations to make the purchase on behalf of the association. A member of the association under their articles was not permitted to represent the association; only its officers had such right.

It is error for the court to order the entire sum paid over to the nominal complainants, but the court is bound to give notice of some kind, and afford to other interested parties an opportunity to prove their claims and participate in the distribution.

In the case of Hallett v. Hallett (I quote from the syllabus), it was held :

" Where there are many persons having claims on a fund, and the shares of a part can not be determined until the rights of all the others are settled and ascertained, as in the case of residuary legatees or creditors of an insolvent estate, all must be made parties, or they must have an opportunity of coming in and substantiating their claims, before any distribution of the fund can be made."

And the court, in the body of the opinion, says :

" And if it appears on the face of the complainant's bill that an account of the whole fund must be taken, and that there are other parties interested in the distribution thereof, to whom the defendants would be bound to render a similar account, the latter may object that all who have a common interest with the complainants are not before the court. In these cases, to remedy the practical inconvenience of making

McDowell v. Joice.

a great number of parties to the suit, and compelling those to litigate who might otherwise make no claim upon the defendants from the fund in their hands, a method has been devised of permitting the complainants to prosecute on behalf of themselves and all others standing in the same situation who may afterward elect to come in and claim as parties to the suit, and bear their proportion of the expenses of the litigation. But such parties neglecting to come in under the decree after a reasonable notice to them for that purpose, the fund will then be distributed without reference to any unliquidated or unsettled claims which they might have had upon the same. But if the rights of such absent parties are known or ascertained by the proceedings in the suit, provision will be made for them in the decree. In either case the court will protect the defendants against any further litigation in respect to the fund."

So in the case of Tunesma v. Shuttler, our Supreme Court held that a distribution could only be made to those who should come in and establish their claims, or to those to whom notice had been given that there is a fund for distribution, so that they may have the opportunity to come in and establish their claims.

Story in his Equity Pleading, Sec. 99, says:

" In all bills of this sort the whole administration and settlemen of the estate is assumed by the court. Estates are marshaled, and the decree is made for the benefit of all the creditors. The other creditors may come in under the decree and prove their debts before the master to whom the case is referred, and obtain satisfaction of their demands equally with the plaintiffs in the suit. And under such circumstances they are treated as parties to the suit. If, however, they decline to come in before the master, they will be excluded from the benefit of the decree, and yet they will from necessity be considered as bound by the acts done under the authority of the court."

It is against all the principles of jurisprudence that an entire fund belonging to many should be paid over to the complainants without giving an opportunity, by notice or

otherwise, to those who were not in court to come in and participate.

Messrs. ALDRICH, PAYNE & DEFREES, CHARLES S. BABCOCK and H. H. C. MILLER, for appellees.

While several propositions of law have been discussed by counsel, it seems to us that the principles involved in this transaction are so plain and simple that a bare reference to them is sufficient.

The Cook County Land Investment Association belongs to the class of organizations referred to in Pettis v. Atkins, 60 Ill. 454, in which it is said by Justice Walker: "This organization not having been formed under any statute, it became a voluntary association, like any other partnership, and must be governed by the law regulating that relation." Being a partnership, a confidential relation existed between every member of the co-partnership, and each was bound to disclose to the other, every fact of importance affecting the joint good.

In Delmonico v. Roundebush, 2 McCrary, in discussing a somewhat similar situation, the court says, p. 23: "The principle which obtains among partners, that all members of a partnership shall be loyal to the general concerns, extends to those who are negotiating for partnership, to the members of joint stock associations, to the directors of corporations, and others who are in the same position of trust and confidence." Cites Collyer on Partnership, 6th edition, 255 and note, and continues: "It is believed that the same rule is applicable to all persons who may be engaged in a common undertaking, and any of the associates are intrusted with the interests of the association. Certainly, it can not be said that of several associates, one may turn the joint concerns or property to his own advantage, without the consent of the others. Whatever the relation of the parties may be, if they have united for a common purpose, they must be loyal to that purpose, and no one or more of the members can, without the consent of

his associates, appropriate to his own use the property of all." See also Morrill v. Colehour, 82 Ill. 618; Roby v. Colehour, 135 Ill. 329.

In Sec. 307 of Bates on Partnership, the author says: " Where a firm is formed for the purpose of purchasing and dealing in a tract of land, or where a firm buys land, a secret arrangement between the seller and one partner by which the latter obtains a reward for inducing the firm to buy, or 'a commission on the sale, or where such partner, having an option to buy, sells to the firm at an advance, he will, of course, be compelled to account for his gains." Citing among other cases, Emory v. Parrott, 107 Mass. 95; Grant v. Hardy, 33 Wis. 668; Faulds v. Yates, 57 Ill. 416. And the principles here announced are abundantly sustained by these cases and many others which may be cited.

Counsel have cited Ely v. Hanford, 65 Ill. 267, and some other cases, to sustain the proposition that if Gilliland and McDowell were the agents of the syndicate in making this purchase, and concealed their interest theretofore obtained in the sale, that would be sufficient ground upon which to have the sale set aside by complainants; but complainants can not elect to take lands from the sale, and at the same time recover for the profits made by such agents. It will be noticed that the cases have no application to the facts of the case at bar.

This is disposed of by the first paragraph of the opinion of Mr. Justice Sheldon, quoted on page 48 of counsel's brief. That is, " This action, we conceive, is sustainable only upon the ground that the relation of principal and agent existed between Hanford and Ely, at the time the latter contracted with Metz for the lot on the 13th of July. If, before that time, Ely had undertaken to act as the agent of Hanford to make the purchase for the latter, he would be liable in this action to refund to Hanford the difference between what Hanford paid him and what he paid Metz for the lot; for, being Hanford's agent, this purchase from Metz would be Hanford's purchase, and Han-

ford would, therefore, be entitled to the full benefit of the contract." This is precisely the case at bar. McDowell and Gilliland were members of the association, owing such a duty to the association that it was impossible for them to have contracted with, in or about the lands affecting the association, without, in law, contracting as such, as the agents of the association, and on its behalf.

In this connection, note the case of Grant v. Hardy, 33 Wis. 668; there, one Hardy, a real estate broker, presented land to Grant for sale for $8,000. He had made an arrangement with Stonebreaker, the owner, for the sale of the property for $6,000. The owner and the agent co-operated to induce Grant to make the purchase, and it was arranged that Grant and Hardy would make the purchase together, Grant three-fourths, Hardy one-fourth. Grant paid $6,000 and Hardy paid the $2,000 which was paid back to him by Stonebreaker. Hardy subsequently sold his quarter interest to Grant for $2,100. Grant learned afterward of the fraud which had been perpetrated upon him, and brought his suit to recover the amount paid by him to Hardy. The Supreme Court sustained the right of recovery, and quoted with approval the following language, p. 674:

"Whenever parties stand in such a relation that while it continues, confidence is necessarily reposed by the one, and an influence, which naturally grows out of a confidence, is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not be impeached if no such confidential relation had subsisted." Citing 1 Story's Eq. Jur., Sec. 323; Willard's Eq. Jur., 169, etc.

And the court held that Hardy was in duty bound to disclose the facts to his principal.

The court, on pages 676–677, after discussing the matter fully, stated: "It is suggested in the brief of counsel for the defendant, that the plaintiff paid no more for his interest than it was actually worth. That may be so. Still, it

does not affect the question we are considering. If a fiduciary relation subsisted, it imposed upon each the duty of acting, relative to the subject-matter, for the best interest of the other."

It is a well settled principle that an agent can not become the purchaser from himself, nor can he set up a nominal vendee, as was done in this case. Hovenden on Fraud, 147; Bigelow on Fraud, 272.

And very interesting cases on the same principle are those of Porter v. Woodruff, 36 N. J. Eq. 174, and Kerfoot v. Hyman, 52 Ill. 512.

Mr. Justice Shepard. In October, 1890, about thirty persons, including the appellants, Maggs, Gilliland and J. E. McDowell, organized an association, under the name of the Cook County Land Investment Association, which was in effect a partnership, for the purpose of dealing in land. No time was limited for its duration. Articles of association and agreement were reduced to writing and signed by all who became members. The writing provided, among other things, that Stephen B. Van Kirk, one of the partners, should take and hold title to all lands which might be acquired, in trust for the partnership, and that three other partners, Maggs, McLennan and Church, should be a managing committee to whom should be intrusted the active control of the affairs of the association.

Shortly afterward, and on the twenty-eighth day of the same month, the said managing committee bought a tract of twenty acres of land in this county, and ten days later sold the same at a price which netted a profit of nearly twenty dollars on each share of stock on which twenty-five dollars had been paid.

The defendant, J. Erwin McDowell, acted as the attorney of the association in all legal matters pertaining to the said purchase and sale, and he was one of the partners. No complaint is made of the administration of the affairs of the association connected with this first purchase and sale.

Immediately after the sale of said twenty-acre tract, and before the transaction had been entirely closed up as between

the members of the association, Maggs, who was one of the managing committee, Van Kirk, who was trustee, appointed to take and hold title, and Gilliland, who was a partner in the association, went out and examined another tract of 160 acres, which at that time belonged to one Thomas Lewis; and such negotiations were subsequently had, by the intervention of J. Erwin McDowell, who knew Lewis, as resulted, on November 15, 1890, in an agreement by Lewis to sell the land for $32,000, which was at the rate of $200 per acre.

Some delays occurred, and it was not until about two weeks later that the contract was actually reduced to writing and signed. The written contract provided for a sale by Lewis to one Anderson E. Martin, who was first seen or known by Lewis in the transaction, at the time of executing the contract, and the payment of $1,000 as earnest money. Martin was a friend of McDowell and Gilliland. The written agreement was dated on November 29th, but, the earnest money not having been raised, it was not signed by Lewis until at the time the $1,000 was paid to him, on December 3, 1890.

Thereupon the following circular was prepared:

"November 29, 1890.

" To the Subscribers of the Cook County Land Investment Association:

"We have an option on 160 acres at Harvey, one mile frontage on Western avenue, running from 151st street to 159th street, at $350 per acre. It is our opinion that this property can be very rapidly turned over at a magnificent advance, and as it is necessary to raise one-fifth the amount of purchase money inside of sixty days, the shares will be of the value of $125, payable $25 cash, $25 one year, $25 two years, $25 three years and $25 four years, with six per cent interest. Before closing this deal, we must have the shares guaranteed, as it will take 500 shares to carry through.

Place your names on other side, and mark against same number of shares you would like allotted to you.

Respectfully yours,
                    MANAGING COMMITTEE."

This circular was passed around and signed by Maggs, Gilliland and McDowell, and many others, with the number of shares each desired to take marked against their names. Martin did not sign, but following under McDowell's name, McDowell wrote:

" Grantor agrees to take last 100 shares if not otherwise disposed of," and McDowell testifies that by " grantor" he meant Martin.

On the same day of the signing of the contract of sale from Lewis to Martin, Martin gave a contract of sale of the same premises to Van Kirk, as trustee, for $56,000, which was at the rate of $350 per acre.

Thereupon McDowell, on December 3, 1890, issued the following circular to the members of the syndicate who had signed the circular issued by the Managing Committee:

" To the Cook County Land Investment Company:

" In accordance with your instructions, I have this day secured a contract with A. E. Martin for the sale of the east half of the east half of section thirteen, township thirty-six north, range thirteen, east of the third principal meridian, and have delivered thereon, as a deposit, the $1,000 furnished by your company, and have placed the contract with the Merchants' National Bank, subject to the joint order of Martin and myself. This contract calls for the payment of $10,200 within sixty days from November 29, 1890, at which time the deed is to be given, together with four notes of $11,200 each, due in one, two, three and four years from November 29, 1890."

(Signed)    J. Erwin McDowell.

12—3—90."

Up to this time there had been no steps taken for the formation of a new association, unless, perhaps, the fact that individuals who had not been interested in the syndicate that bought the first twenty acres, had subscribed to the circular sent out by the managing committee concerning the purchase of the 160 acres, might be so considered. J. Erwin McDowell, who had acted as attorney in all legal matters pertaining to the first purchase, was acting as such

in the 160 acre purchase, and so far as appears, the old association was still in active existence.

Both the contracts for the sale by Lewis to Martin, and by Martin to Van Kirk as trustee, bore the same date, and were by their terms to be performed within precisely the same time.

Van Kirk had refused to act alone as trustee in the 160 acre purchase, because he feared so great a responsibility, and it had been agreed that J. Erwin McDowell should act with him in that manner, as co-trustee.

On January 14, 1891, a meeting of the managers of the association was held and the proceedings of that meeting appear sufficiently in the following circular of the treasurer of the association sent to the several members:

"COOK COUNTY LAND INVESTMENT COMPANY,
Room 70, 159 La Salle street.

"At a meeting of the managers of the Cook County Land Investment Company, held at 7:30 P. M., January 14th, the trustee's and treasurer's reports were read and accepted and a dividend declared of $19.50 per share, thus closing out the purchase and sale of twenty acre tract at Harvey.

A tract of 160 acres at same place was contracted for on the 29th day of November, 1890, and $1,000 paid on December 3d last, as earnest money, and balance of first payment, viz., $10,200, has to be paid on January 28th, when a deed will be given to Stephen Van Kirk and J. E. McDowell, (attorney) acting as joint trustees. Subscribers to this deal must pay their first installment of $25 per share to the treasurer on or before the 20th of January, as in case of non-payment by that date, the managing committee will have to dispose of shares to other parties; for if money is not paid and deed taken up on the 28th inst., the $1,000 earnest money will be forfeited.

Treasurer has in his possession $347.50 to your credit; kindly remit balance due, viz., $27.50, to secure your shares in 160 acre deal, and return your receipts for shares in old deal, upon receipt of which treasurer will forward you a new one.

C. H. BIESTER, Treasurer."

It thus appears that the managing committee at this meeting transacted business in reference to both the twenty acre and the 160 acre deals, and that the investment and income from the twenty acre deal could apply toward subscriptions to the 160 acres.

Van Kirk had objected to signing purchase money notes for the large amount of deferred payments going to Lewis, and so had Martin, and Lewis himself seems to have been unwilling to execute the covenants in a warranty deed wherein the consideration to be expressed was $24,000 greater than what he was to receive.

These difficulties were overcome by Martin directing Lewis, in writing, to make a deed to John S. McDowell, a brother of J. Erwin McDowell, who, it was arranged, should take the title for the stockholders, and execute the notes and trust deeds for the balance due to Lewis, and for the excess over what was going to Lewis, and by the giving, by John S. McDowell to Lewis, a writing exempting Lewis from liability on his covenants beyond the consideration of $32,000, which he was actually to receive.

These writings were as follows:

"Chicago, Ill., January 28, 1891.

Thomas Lewis, Esq.,

*Dear Sir:* Please make deed of conveyance of a certain contract made with me November 29, 1890, now in escrow in the Commercial National Bank, to John S. McDowell. I have relinquished all right to said contract.

Yours truly,
A. E. Martin."

"Thomas Lewis, Esq.,

Having taken the land in the above assignment by warranty deed for $56,000, I agree that the warranty shall not extend to more than $32,000.

John S. McDowell.

Dated January 28, 1891."

Lewis then conveyed the land to John S. McDowell, and received from J. Erwin McDowell $7,000 in cash and two notes of $8,000 each, payable in three and four years,

respectively, with interest, secured by a first lien on the property by trust deed to John N. Olmstead, executed by John S. McDowell; and as of the same date, John S. McDowell executed a second trust deed to Newton Wyeth, trustee, securing nine notes, one each for $2,000 and $1,200 due in one year; one each for $2,000 and $1,200 due in two years; two for $3,000 and one for $1,200, due in three years, and one for $6,000 and one for $1,200, due in four years, a total of thirteen notes.

New articles of agreement and association were prepared by J. Erwin McDowell, and submitted at the meeting on January 14, 1891, and were signed by some seventy-five persons, including McDowell and Gilliland. The provisions of the new agreement were substantially like those of the first articles, excepting that they provided for John S. McDowell as a co-trustee with Van Kirk, and specified the particular tract of 160 acres that had been purchased. All who had signed the first agreement were given an opportunity to sign the last one, and many did so. In consequence of the purchase being a much larger one, quite a number of persons became subscribers to the new purchase, who were not interested in the first, or twenty acre transaction.

We can not go into all the details of the two purchases without extending this opinion to an undue length.

Enough has been stated to show the facts upon which the bill was based, for the purpose of holding Gilliland, McDowell and Martin as trustees, and to avoid the trust deeds and notes given to secure payment of the difference between what Lewis sold the land for and the price at which it was turned over to the association.

The defense rests mainly upon the contention that there were two entirely distinct associations, and that the defendants were not agents of either one in the 160 acre transaction; and while there is evidence tending to establish the defense, the overwhelming weight of the evidence, in our opinion, sustains all the material allegations of the bill.

The master found the facts to be substantially as stated in the bill, and the Circuit Court entered a decree finding

that the association was a copartnership; that J. Erwin McDowell was its attorney, and that both he and Gilliland were members of the partnership; that Martin never had any *bona fide* interest in the 160 acres, but was a mere instrument of Gilliland and J. Erwin McDowell to defraud their copartners, and had knowledge of their unlawful scheme; that J. Erwin McDowell, Gilliland and Martin, were joint tort-feasors, and must account for the $3,200 received by them from the association, over what was paid to Lewis, and that the notes secured by trust deed for $20,800, representing the difference between what was agreed to be paid to Lewis, and what the land was turned into the association at, should be given up and canceled, and that trust deed released.

We think the decree of the Circuit Court was most clearly right.

Whether there was or was not more than one association in fact, can make no difference. The second agreement was but an enlargement of the first, adapted to the new conditions. It in no way extinguished the first. The mere fact that other persons united with those, or a part of those, in the original transaction, could not change the duties and obligations of the persons intrusted with its affairs. The success of the first venture was the basis of the second, and the funds derived from the first were largely used in carrying through the second. No pretense was made of any independence between the two transactions, or that all who were in the first should not be in the second, provided they put up the additional funds needed, and no one interested in the first, outside of the fraudulent scheme involved in the second, was informed of any change in the relations of the parties, until it became necessary to assert that such a change had taken place, in order to defend against the iniquity complained of.

The scheme to buy the land of Lewis through an intermediary, and turn it over to the association at an increased price of $24,000, was a fraud upon every member of the association who joined in that purchase. The parties to that

fraudulent scheme were trustees, and the Circuit Court rightly so held.

The remarks of the court on the last page of the opinion in Robbins v. Butler, 24 Ill. 387, are pertinent here. There is nothing in the character of the defense that we can discern, recommending it to the favorable consideration of a court of equity.

The objections to the form of the decree are not sustainable. The bill is filed by some of a very numerous body of shareholders, to enforce a common benefit in behalf of a class of persons, against a few of their associates who are specially charged with fraud, and as such is maintainable. The distribution of the fruits, by way of money, of the decree, is the question for which the court would always be open. Cockburn v. Thompson, 16 Vesey, Jr., 327.

The decree of the Circuit Court will be affirmed.

*Decree affirmed.*